**Sharon JACOBS a/k/a Sharon Burton**

v.

**Ashwin CHATWANI, M.D. and Temple University Hospital.**

**Appeal of: Sharon Burton.**

Superior Court of Pennsylvania.

Argued Oct. 31, 2006.
Filed April 13, 2007.

Jane B. Marton, Philadelphia, for appellant.

Deborah M. Knight, Philadelphia, for appellees.

BEFORE: BENDER, BOWES, JJ., and McEWEN, P.J.E.

OPINION BY BENDER, J.:

¶ 1 The plaintiff in this medical malpractice case, Sharon Jacobs a/k/a Sharon Burton (hereinafter "Plaintiff"), appeals from the September 26, 2005 judgment[1] entered in favor of the defendants, Ashwin Chatwani, M.D., ("Dr. Chatwani") and Temple University Hospital ("Hospital"), (collectively, "Defendants"). Plaintiff alleged that Dr. Chatwani was negligent in his performance of her hysterectomy, claiming that he injured her left ureter during the procedure resulting in the formation of a ureteral vaginal fistula and leakage of urine into her vagina. Following a jury verdict in favor of Defendants, Plaintiff took the instant appeal, in which she, *inter alia*, challenges the qualifications of Defendants' urology expert and various other evidentiary rulings. We affirm.

---

1. We have revised the caption to reflect that the appeal is properly taken from the judg-

¶ 2 The trial court set forth the following factual summary of this case:

In 1996, Plaintiff first came under the care of Dr. Chatwani, a Board-certified [obstetrician/gynecologist] and surgeon, after she developed fibroids of the uterus. [Plaintiff], who was overweight, was suffering from cardiomyopathy, and was anemic[,] was a practicing Jehovah's Witness, whose religious beliefs ruled out blood transfusions. As a consequence of this, Dr. Chatwani began a course of treatment that did not involve surgery. It, however, was unsuccessful. There was evidence presented indicating that Plaintiff did not fully comply with the recommended course of treatment.

In November of 2000, Plaintiff agreed to undergo surgery to treat her fibroids. She was advised by Dr. Chatwani of the mechanics of the procedure he intended to perform upon her as well as the risks involved in the surgery, including possible harm to her ureter. Upon being so advised, Plaintiff agreed to undergo the surgery.

During the performance of the surgery, Dr. Chatwani took precaution to avoid injuring Plaintiff's ureters. When he completed the hysterectomy, Dr. Chatwani checked both ureters to ascertain whether they had suffered any injury. The tests were negative for injury, including a ureto-vaginal fistulae.

Plaintiff next saw Dr. Chatwani on January 12, 2001, for post-surgical examination. On that date, Plaintiff complained of persistent fevers, chills, sweating, and a pus discharge and odor from the surgical incision. She however, did not have a fever on the 12th.

On January 13, 2001, Plaintiff telephoned Dr. Chatwani's office and ad-

ment entered on the verdict on September 26, 2005.

vised him that she passed clear fluid four or five times since the previous evening. Dr. Chatwani had her come to his office immediately, where he performed a test to ascertain whether Plaintiff had developed a vesico-vaginal fistula. The test was negative and the doctor surmised that the fluid discharge had been caused by something else. He advised the Plaintiff that he would keep her under observation for a couple of days.

Plaintiff continued to leak fluid and on January 16, 2001, she underwent a retrograde urogram and during the procedure, she had a Double J stent inserted by Michael Pontari, M.D., Board-certified urologist, which remained in place until March 21, 2001.

On April 2, 2001, Plaintiff saw Dr. Chatwani. His examination of her revealed nothing abnormal. In a subsequent follow-up visit with Dr. Pontari, he noted that Plaintiff complained of left lower abdominal discomfort that dissipated with the use of an over-the-counter analgesic. Subsequent thereto, in March and May of 2001, Plaintiff underwent two IVP procedures. In addition, in May of 2001, testing showed that Plaintiff had left-kidney caliectasis that resolved with Lasix. She did not appear for a third IVP procedure scheduled some three months thereafter.

Plaintiff saw a Dr. Bagley on January 30, 2003, because she felt discomfort in her left lower quadrant and sometimes suffered from the frequent urge to urinate. Dr. Bagley did not recommend a course of treatment or suggest a follow-up. Since that time, Plaintiff has not receive[d] any care. She has not suffered any other symptoms following the removal of the stent which occurred in March of 2001.

Trial Court Opinion (T.C.O.), 6/30/06, at 2–3.

¶ 3 Plaintiff filed a complaint against Dr. Chatwani and Hospital on November 27, 2002. Defendants filed preliminary objections. On January 21, 2003, the trial court granted Defendants' preliminary objections insofar as to strike allegations of gross negligence and recklessness in the complaint. On March 7, 2003, Defendants filed their answer to the complaint.

¶ 4 Plaintiff filed a motion *in limine* on April 15, 2005, in which she sought to exclude evidence that she is a Jehovah's Witness and was uncooperative with pre-surgical treatments. She also sought to exclude the testimony of Defendants' urology expert, Irvin H. Hirsch, M.D. As further explained below, Dr. Hirsch opined that the injury to Plaintiff's ureter was not due to any negligence in the performance of the hysterectomy but, rather, was the result of a known risk involved in this type of surgery from temporary loss of blood supply to the ureters occurring when the uterine arteries are clamped-off in order to remove the uterus. In any event, the trial court denied Plaintiff's motions *in limine.* Trial commenced on May 3, 2005, and ended with a jury verdict in Defendants' favor on May 5, 2005. The trial court denied Plaintiff's post-trial motions, and judgment was entered on the verdict on September 26, 2005.

¶ 5 Plaintiff filed the present appeal on September 30, 2005. She sets forth the following "Statement of Questions Involved" in her brief:

1. Was Irvin H. Hirsch, M.D. qualified to testify as an expert on behalf of the defendants?

2. Did the trial court err when it permitted Dr. Hirsch to testify as to his ureteral devascularization theory?

3. Did the trial court err when it permitted evidence to be admitted to

the effect that (1) plaintiff is a Jehovah's Witness and (2) plaintiff was uncooperative with presurgical care?

4. Did the trial court err when it refused to allow plaintiff's counsel to cross-examine Dr. Belford–Budd on a learned treatise?

5. Did the trial court err when it refused to allow plaintiff's counsel to cross-examine Dr. Belford–Budd concerning medical malpractice lawsuits against her?

Plaintiff's brief at 4 (suggested answers omitted).

■■■■ ¶ 6 In her first issue, Plaintiff asserts that the trial court erred by qualifying Dr. Hirsch, a board-certified urologist, to testify as a defense expert on the standard of care pertaining to an obstetrician/gynecologist performing a hysterectomy. She contends that he was not qualified to do so under both common law standards and under the Medical Care Availability and Reduction of Error Act (MCARE Act), 40 P.S. §§ 1303.101–1303.1115. In reviewing this issue, we first note that "[w]hether a witness has been properly qualified to give expert witness testimony is vested in the discretion of the trial court. It is well settled in Pennsylvania that the standard for qualification of an expert witness is a liberal one." *Wexler v. Hecht,* 847 A.2d 95, 98 (Pa.Super.2004) (citations and quotation marks omitted). Thus, we may reverse the trial court's decision regarding admission of expert testimony only if we find an abuse of discretion or error of law. *Smith v. Paoli Mem'l Hosp.,* 885 A.2d 1012, 1016 (Pa.Super.2005). Furthermore, because the issue regarding an expert's qualifications under the MCARE Act involves statutory interpretation, our review is plenary. *Id.*

¶ 7 In response to Plaintiff's claim, the trial court stated that Plaintiff was mistaken in her assertion that Dr. Hirsch testified on the standard of care applicable to an obstetrician/gynecologist performing a hysterectomy. T.C.O. at 3. The trial court explained that Dr. Hirsch "did not testify about the standard of care of an obstetrician/gynecologist but rather about the standard of care involved in avoiding uretal injury during abdominal surgery and about a diagnostic test used to determine whether a ureter was damaged during surgery, subjects which surely were within his area of expertise." *Id.* at 3–4. We agree, and we conclude initially that Dr. Hirsch was qualified to provide this testimony under both the MCARE Act and common law standards.

¶ 8 Since 2002, section 1303.512 of the MCARE Act has delineated requirements for qualifying experts in medical malpractice cases. In pertinent part, this statutory provision reads as follows:

(a) **General rule.**—No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.

(b) **Medical testimony.**—An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:

(1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.

(2) Be engaged in or retired within the previous five years from active clinical practice or teaching.

. . .

**(c) Standard of care.**—In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:

(1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.

(2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).

(3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e).

**(d) Care outside specialty.**—A court may waive the same subspecialty requirement for an expert testifying on the standard of care for the diagnosis or treatment of a condition if the court determines that:

(1) the expert is trained in the diagnosis or treatment of the condition, as applicable; and

(2) the defendant physician provided care for that condition and such care was not within the physician's specialty or competence.

**(e) Otherwise adequate training, experience and knowledge.**—A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period.

40 P.S. § 1303.512.

¶ 9 Plaintiff does not dispute Dr. Hirsch's qualifications under subsections (a) or (b) of the MCARE Act.[2] Rather, as noted above, Plaintiff claims that Dr. Hirsch was not qualified to testify about the "standard of care required of one performing a hysterectomy." Plaintiff's brief at 11. Plaintiff specifically challenges Dr. Hirsch's qualifications under subsection (c)(2), claiming that he does not practice in the same subspecialty as Dr. Chatwani or another subspecialty that has a substantially similar standard of care for the specific care at issue. Plaintiff asserts that the trial court erred by concluding that Dr. Hirsch's "field of expertise encompassed

---

**2.** The voir dire on Dr. Hirsch's qualifications revealed that he is a urologist, meaning that he "specializes in a subspecialty of surgery that deals with diseases of the urinary system in men and women and in the reproductive system in men." N.T. Trial, 5/4/05, at 87. Dr. Hirsch has an extensive educational background, he is board-certified in urology, and the nature of his practice includes surgery. *Id.* at 87–88. Dr. Hirsch has been a clinical professor of urology at Jefferson Medical College since 1997. *Id.* He is a member of several professional organizations and has published numerous articles on urology. *Id.* at 89. He is familiar with the standards related to cystoscopy following gynecologic sur-

gery, intraoperative precautions to protect the ureters during pelvic surgery, and diagnostic procedures to test for potential urologic injuries. *Id.* at 90–91. Dr. Hirsch admitted that a large majority of his practice involves the treatment of male urologic problems, and that he has not performed a hysterectomy in about 25 years. Nevertheless, he does treat female patients, and stated that he had seen a female patient within month preceding this trial. *Id.* at 93–94. He also testified that he is "familiar with female considerations in urology and ... [is] familiar with the structures in the body that are common to both women and men." *Id.*

the medical care being challenged." *Id.* at 13 (citing T.C.O. at 4). Plaintiff also argues that Dr. Hirsch was not qualified to opine that "Dr. Chatwani adhered to the requisite standard of care by taking 'necessary measures to protect the ureter.'" *Id.*

¶ 10 In support of her position, Plaintiff points to the following testimony of Dr. Hirsch elicited on direct examination by defense counsel, set forth here in context:

Q. Doctor, do you have an opinion to a reasonable degree of medical certainty with respect to the routine performance of a cystoscopy subsequent to the performance of a hysterectomy, in general?

[Dr. Hirsch]: It's not commonly done and when it is done, it's sort of like a bonus for the patient and the physician. It's not recommended within the standard of care for a gynecologist to do a cystoscopy to look within the bladder following a hysterectomy.

[Plaintiff's counsel]: Objection, Your Honor.

THE COURT: Overruled.

[Dr. Hirsch]: And, frankly, I was impressed that Dr. Chatwani did this common urologic procedure for a gynecologic patient.

. . .

Q. Are there occasions when you and other urologists are asked to come into a setting or urologists are asked to come into a setting or operating room during a gynecologic procedure to perform a cystoscopy?

[Dr. Hirsch]: Yes.

Q. Do you have an opinion to a reasonable degree of medical certainty with respect to the standard of care exercised by Dr. Chatwani during the surgery to protect the ureters?

[Plaintiff's counsel]: Objection.

THE COURT: Overruled.

[Dr. Hirsch]: Yes, I read the operative report and I'm familiar with Dr. Chatwani's deposition transcript. I read that. And in it he indicates that he had the ureter under control throughout the procedure; that he was comfortable with where the ureter was and took the necessary measures to protect the ureter.

This is, by the way, the ureter is the most—the ureter and the bladder are of utmost concern to gynecologists when they're doing hysterectomies for benign disease or for cancer. They are—they always have their antenna up with respect to the ureter and to the bladder, making sure there is no injury.

N.T. Trial, 5/4/05, at 101–103. We agree with the trial court that, contrary to Plaintiff's assertion, Dr. Hirsch did not testify regarding the standard of care in the performance of a hysterectomy. Rather, the testimony above reveals that Dr. Hirsch testified specifically with regard to the common urologic procedure of cystoscopy and protection of the ureters during surgery, which is subject to the same standard of care whether the person performing the pelvic surgery is a urologist or a gynecologist. Other parts of the trial record reveal that Dr. Hirsh provided extensive testimony with regard to the diagnostic procedures that had been performed on Plaintiff postoperatively, such as cystoscopy, indigo carmine infusion, and intravenous pyelogram (IVP), all of which were well within his area of expertise. *See id.* at 95–98. He also provided testimony with regard to causes of uretal injury, as further described below. Thus, the trial court did not err by concluding that Dr. Hirsch's testimony was within his area of expertise as a board-certified urologist—a field that encompassed the specific care being challenged. *See* 40 P.S. § 1303.512(c).

¶ 11 Moreover, Plaintiff tends to mischaracterize Dr. Hirsch's testimony when she asserts that he opined that Dr. Chatwani took the necessary steps to protect the ureter. In the full context in which this statement was given, *supra,* it appears that Dr. Hirsch merely reiterated what he had read from Dr. Chatwani's deposition testimony, and voiced his opinion that protection of the ureters during surgery such as that performed here is of the utmost importance. Moreover, as a board-certified urologist who performs pelvic surgery, *see supra* note 2, he was qualified to opine on the specific care at issue, that is, protection of urological structures during pelvic surgery. As noted in *Smith,* "[t]he 'same subspecialty' ideal contained in § 1303.512(c)(2) includes an express caveat, reflecting the Legislature's decision to afford the trial court discretion to admit testimony from a doctor with expertise in another specialty that has a 'similar standard of care for the specific care at issue.'" *Smith,* 885 A.2d at 1020 (quoting *Herbert v. Parkview Hosp.,* 854 A.2d 1285, 1294 (Pa.Super.2004)). Thus, in sum, the trial court in the instant case did not abuse its discretion in concluding that a board-certified urologist, who performs pelvic surgery, was qualified under the MCARE Act to opine on the standard of care related to protection of the ureters during pelvic surgery and to opine on diagnostic testing of urological structures following pelvic surgery, all of which were directly within his area of expertise.

■ ¶ 12 In the second part of her first issue, Plaintiff claims that Dr. Hirsch was not qualified to testify as an expert under the common law because his "practice centers on the urologic disorders of men." Plaintiff's brief at 18. Under the common law:

> In order to qualify as an expert in a given field, a witness must possess more expertise than is within the ordinary range of training, knowledge, intelligence, or experience. The test to be applied when qualifying a witness to testify as an expert witness is whether the witness has **any reasonable pretension to specialized knowledge on the subject under investigation.**
>
> If a witness possesses neither experience nor education in the subject matter under investigation, the witness should be found not to qualify as an expert.

*Yacoub v. Lehigh Valley Med. Assocs., P.C.,* 805 A.2d 579, 591 (Pa.Super.2002) (*en banc*) (citations and quotation marks omitted).

■ ¶ 13 Although Dr. Hirsch admitted that his patients are 95% men, he further stated that he is familiar with "female considerations in urology" and is "familiar with structures in the body that are common to both men and women." N.T. Trial, 5/4/05, at 93. Furthermore, he indicated that he treats female patients and had treated a female within the previous month. *Id.* at 94. Accordingly, we cannot conclude that the trial court abused its discretion in qualifying Dr. Hirsch as an expert in this case on the basis asserted by Plaintiff, *i.e.,* that he primarily treats male patients. Rather, the record establishes that Dr. Hirsch was eminently qualified, and in fact had more that a "reasonable pretension to specialized knowledge on the subject matter under investigation," which subject matter included testimony concerning protection of urologic structures during pelvic surgery, postoperative diagnostic procedures to detect possible injury to urologic structures, and causes of postoperative ureteral injury. *See, e.g., Kearns v. Clark,* 343 Pa.Super. 30, 493 A.2d 1358 (1985) (concluding that urologist who was "familiar with the pre-operative identification and protection of ureters and had assisted in the performance of prior

960 ■ ▬▬▬▬

hysterectomies" was competent to evaluate and express an opinion about the performance defendant gynecologist in medical malpractice case involving suture-related injury to ureter during hysterectomy).

¶ 14 In her second issue, Plaintiff argues that the trial court erred by permitting Dr. Hirsch to testify about his opinion as to the cause of Plaintiff's injury, *i.e.*, ureteral devascularization, because (1) he did not state his opinion with the requisite degree of certainty; (2) his report was submitted late, following the deadline set in the case management order; and (3) his opinion was cumulative. In addressing Plaintiff's arguments, we first note that:

> [w]hen we review a ruling on the admission or exclusion of evidence, including the testimony of an expert witness, our standard is well-established and very narrow. These matters are within the sound discretion of the trial court, and we may reverse only upon a showing of abuse of discretion or error of law. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. In addition, [t]o constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

*Freed v. Geisinger Med. Ctr.*, 910 A.2d 68, 72 (Pa.Super.2006) (citations and quotation marks omitted).

¶ 15 At trial, Dr. Hirsch explained that the uterine arteries, which supply blood to both the uterus and the ureters, must be "tied-off" during surgery in order to remove the uterus. N.T. Trial, 5/4/05, at 100. This necessary interruption of blood supply during the surgical procedure, especially in patients like Plaintiff who have cardiovascular disease, may result in scarring to the ureter, known as a devascularization injury. *Id.* at 100, 107–108. He opined that even "if a surgery is done perfectly technically correct, and even if you have your eyes on the ureter throughout your operation ... nature takes its course, scarring is a natural phenomenon and that can result in leakage of urine." *Id.* at 108. He opined that Plaintiff's medical history of vascular disease, hypertension, pulmonary embolism, blood clots, and heart failure, may have contributed to the risk of devascularization injury. *Id.* at 109–110. At trial and in his reports, he opined that the delayed onset of Plaintiff's urinary leakage, *i.e.*, three to four weeks postoperatively, suggested a devascularization injury rather than an injury to the ureter occurring during the course of the surgery. In other words, he opined that if the injury had been caused intraoperatively, as by a needle puncture, the symptom of urinary leakage would have manifested itself immediately or at least within the first postoperative week. *See id.* at 107–109; Dr. Hirsch's report, 8/16/04, at 2.

¶ 16 Plaintiff first argues that Dr. Hirsch's opinion that her urinary leakage was caused by a devascularization injury was not stated to a reasonable degree of medical certainty. She points to his reports and the trial record where he indicated that the delayed appearance of urinary leakage "supports," "strongly supports," and "speak[s] for" a theory of ureteral devascularization. *See* Dr. Hirsch's report, 8/16/04, at 2; N.T. Trial, 5/4/05, at 107. The trial court indicated that, while Dr. Hirsch "did not indicate in his expert reports that he believed to a degree of medical certainty that ureteral devascularization was the cause of Plaintiff's medical problem, he did do so at trial. Given this, Plaintiff's claim surely lacks merit inasmuch as counsel does not

object on the basis that the doctor's opinion was not set forth in his report." T.C.O. at 5. The record supports the trial court's conclusion. Although Dr. Hirsch used the terms "supports" and "strongly supports" in his reports, in giving his opinion at trial, he testified that he "infer[red] with a reasonable degree of certainty" that the ureter was damaged by devascularization, given the timing of the onset of urinary leakage. N.T. Trial, 5/4/05, at 107. Thus, Plaintiff's contention that he did not state his opinion with the requisite degree of certainty is belied by the record.

¶ 17 In any event, Pennsylvania law does not require a defense expert in a medical malpractice case to state his or her opinion to the same degree of medical certainty applied to the plaintiff, who bears the burden of proof at trial. *Neal by Neal v. Lu,* 365 Pa.Super. 464, 530 A.2d 103, 110 (1987). In *Neal,* the defendant surgeon offered rebuttal testimony, opining that a "possible" cause of the condition the plaintiff complained of was not negligence in performance of the surgery but, rather, the accident that precipitated the surgery. *Id.* at 109–110. We concluded that the trial court did not abuse its discretion in admitting this testimony because the burden of proving causation, with "reasonable medical certainty," rested with the plaintiff. *Id.* at 109. We stated:

> Absent an affirmative defense or a counterclaim, the defendant's case is usually nothing more than an attempt to rebut or discredit the plaintiff's case. Evidence that rebuts or discredits is not necessarily proof. It simply vitiates the effect of opposing evidence. Expert opinion evidence, such as that offered by [the defendant] in this case, certainly affords an effective means of rebutting contrary expert opinion evidence, even if the expert rebuttal would not qualify as

proof. In general, the admission or rejection of rebuttal evidence is within the sound discretion of the trial judge.

*Id.* at 110 (citations and quotation marks omitted). We concluded that the defendant surgeon's opinion was stated with a degree of certainty appropriate for rebuttal purposes, which was less than the "reasonable degree of medical certainty" standard. *Id.* In the instant case, Dr. Hirsch's opinion in his report that the delayed appearance of urinary leakage "supports," and "strongly supports," a theory of ureteral devascularization, was stated to a sufficient degree of certainty for rebuttal purposes. *See* Dr. Hirsch's report, 8/16/04, at 2.

¶ 18 Plaintiff also asserts that the trial court abused its discretion by admitting Dr. Hirsch's opinion at trial because his reports were submitted after the discovery deadline established in the case management order. Plaintiff argues that the case management order required that all of Defendants' expert reports be provided on or before August 2, 2004. Plaintiff's brief at 21. However, Plaintiff received Dr. Hirsch's first report, dated August 16, 2004, on September 10, 2004, which report revealed his devascularization theory, and she received two supplemental reports thereafter.

¶ 19 The trial court should consider the following factors when determining whether or not to preclude a witness from testifying for failure to comply with a discovery order:

(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified,

(2) the ability of that party to cure the prejudice,

(3) the extent to which waiver of the rule against calling unlisted witnesses

would disrupt the orderly and efficient trial of the case or of cases in the court,

(4) bad faith of [sic] willfulness in failing to comply with the court's order.

*Smith v. Grab,* 705 A.2d 894, 902 (Pa.Super.1997) (citations omitted). Additionally,

In the absence of bad faith or willful disobedience of the rules, the most significant considerations are the importance of the witness' testimony and the prejudice, if any, to the party against whom the witness will testify. Further, we note that [t]o preclude the testimony of a witness is a drastic sanction, and it should be done only where the facts of the case make it necessary.

*Id.* at 902–903 (citations and quotation marks omitted).

¶ 20 In the instant case, the trial court concluded that Plaintiff failed to establish how she was prejudiced by receipt of Dr. Hirsch's report following the discovery deadline, in that she received the report almost eight months prior to trial. However, in this appeal, Plaintiff argues that she was prejudiced because Dr. Hirsch's report "interjected new theories never before presented in this litigation." Plaintiff's brief at 22. Specifically, Plaintiff contends that, at his deposition, Dr. Chatwani "admitted that the ureter was injured . . . and that he believed that it was caused by a needle that went through the ureter during surgery." *Id.* She contends that prejudice resulted from the receipt of Dr. Hirsch's opinion after the discovery deadline because he introduced an alternate theory of causation, *i.e.,* devascularization, that contradicted the alleged admission of Dr. Chatwani at his earlier deposition.

¶ 21 Plaintiff's allegation of prejudice on this asserted basis is without merit. At his deposition, Dr. Chatwani indicated that at the time Plaintiff presented with urinary leakage postoperatively, and in an effort to determine its cause, his thought process was that the ureter may have had a needle injury that may have resulted in a partial injury, given that the cystoscopy performed immediately postoperatively revealed that the ureter was not transected and because the stent later inserted by Dr. Pontari went in "very easily." He therefore concluded, in reference to what he was thinking at that particular time: "[s]o my personal thinking is that there was a needle which went through the ureter and caused a partial injury." Contrary to Plaintiff's characterization of the record, Dr. Chatwani did not admit to a needle injury to the ureter but, rather, was explaining his thinking as to the possible causes of Plaintiff's urinary leakage at the time she presented to him with that complaint. Dr. Chatwani had an opportunity to clarify this point at trial, where he denied ever making an admission to anyone that he had put a stitch in the ureter, and where he clarified that his deposition testimony was merely in reference to his thought process at the time Plaintiff presented with her postoperative complaint. N.T. Trial, 5/3/05, at 47–48.

¶ 22 Moreover, and perhaps more strikingly, Plaintiff fails to establish prejudice or surprise in that her own expert fully rebutted Dr. Hirsch's devascularization theory at trial by, *inter alia,* calling it "absurd" and relating to the jury his own reasons for concluding that devascularization was unlikely. *See* N.T. Trial, 5/2/05, at 141–42. The fact that the jury may have believed Dr. Hirsch's opinion rather than the opinion proffered by Plaintiff's expert does not equate to prejudice.

¶ 23 The third argument presented in support of Plaintiff's second issue is that Dr. Hirsch's testimony was cumulative. Plaintiff cites to Pa.R.E. 403 for the proposition that the trial court has the power to preclude evidence "by consider-

ation of ... needless presentation of evidence." Plaintiff's brief at 23. In support of this argument, Plaintiff vaguely asserts that defense expert Catherine Belford–Budd, M.D., "gave testimony exonerating the defendants," that defendant Dr. Chatwani "also expressed opinions as to the standard of care as it applies to him[,]" and that "[i]t was unfair for the defense to be permitted to have three experts in this case." *Id.* In this undeveloped argument, spanning no more than seven lines and containing no citation to the record, Plaintiff fails to provide any explanation as to how Dr. Hirsch's testimony was cumulative to that of any other witness. Accordingly, this issue is waived. Pa.R.A.P. 2119. *See also, e.g., Siculietano v. K & B Amusements Corp.*, 2006 PA Super 380, ¶ 14, 915 A.2d 130 (waiving issue for failure to develop argument where appellant merely made a "passing reference" to asserted challenge on appeal). *See also* T.C.O. at 6–7 (explaining that Dr. Hirsch's testimony was not cumulative because it was presented to rebut Plaintiff's expert's opinion concerning damages and other defense witnesses did not provide similar testimony).

¶ 24 In her third issue, Plaintiff argues that the trial court erred by admitting evidence that Plaintiff (1) is a Jehovah's Witness, and (2) was uncooperative with pre-surgical treatment, "because both are irrelevant to the central issues in this case—whether the defendant surgeon was negligent when he perforated plaintiff's left ureter during surgery and whether he was negligent in his post-surgical management of this perforation." Plaintiff's brief at 24.

¶ 25 Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa.R.E. 401. "All relevant evidence is admissible, except as otherwise provided by law." Pa.R.E. 402. "Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Pa.R.E. 403.

¶ 26 With regard to the evidence that Plaintiff is a Jehovah's Witness, during pretrial argument before the court on Plaintiff's motion *in limine*, Defendants indicated that they would be "happy to redact references to [P]laintiff's religion from the records, but that fact that she refuses blood products, the jury doesn't need to know why, is clearly relevant to the thought process at the time and the surgery at issue." N.T. Trial, 5/2/05, at 7. Despite Defendants' willingness to avoid reference to Plaintiff's religion, the trial court refused Plaintiff's motion *in limine*. *Id.* The trial court deemed that this evidence "was relevant to show the reason why Dr. Chatwani decided upon the course of treatment he followed and how Plaintiff's religious beliefs affected the decision-making process. Such testimony was not introduced to stigmatize the Plaintiff or undermine her credibility or competency." T.C.O. at 7.[3]

---

**3.** In support of her argument, Plaintiff points to Pennsylvania law, which provides that "[n]o witness shall be questioned, in any judicial proceeding, concerning his religious belief; nor shall any evidence be heard upon the subject, for the purpose of affecting either his competency or credibility." 42 Pa.C.S. § 5902(b). *See also* Pa.R.E. 610 ("Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness' credibility is impaired or enhanced."). However, contrary to Plaintiff's assertion, the evidence was not admitted to

¶ 27 Indeed, despite Defendants' willingness to avoid referencing religion, Plaintiff's own counsel was the first to raise the issue in her opening statement. N.T. at 45. Nevertheless, we conclude the trial court did not abuse its discretion in deeming the evidence relevant and admissible, as it was introduced not to undermine Plaintiff's credibility, but rather to provide context to the decision-making process involved in Plaintiff's course of treatment, which was impacted by the fact that Plaintiff refused blood transfusions for religious reasons.

¶ 28 Specifically, Plaintiff, who presented to Dr. Chatwani with heavy menses and cramping in 1996 due to a fibroid uterus, indicated at that time that she preferred a myomectomy (*i.e.,* removal of the fibroid tumors within the uterus) to a hysterectomy. N.T. Trial, 5/3/05, at 16–18. Because Plaintiff was anemic, and because her religion forbade receipt of blood transfusions, Dr. Chatwani suggested trying pharmaceutical treatment with Lupron in an effort to shrink the fibroids and decrease the amount of bleeding occurring with her menstrual periods. *Id.* at 19. However, Plaintiff failed to follow-up with her monthly Lupron injections and she did not schedule the myomectomy. *Id.* at 18–19. To complicate matters further, at the time, Plaintiff was taking Coumadin, a blood-thinner, for treatment of a cardiac condition. *Id.* at 20–21. This contributed to her heavy menses. *Id.* at 21.

¶ 29 Additionally, Dr. Chatwani testified that a myomectomy involves a heavier risk of bleeding. *Id.* Since Plaintiff remained anemic and would refuse blood transfusions, Dr. Chatwani determined that a myomectomy would not be appropriate. *Id.* Indeed, on direct examination, Plaintiff testified that, at one point, Dr. Chatwani and she had discussed a myomectomy, but that it was not an option for her because it "was a bloody surgery." *Id.* at 12. Dr. Chatwani also considered offering Plaintiff a procedure called uterine artery memorization, which may have decreased the size of the fibroids, but Plaintiff's cardiologist advised against that procedure due to the severity of Plaintiff's cardiomyopathy. *Id.* at 21–22.

¶ 30 By November of 2000, Plaintiff continued to have heavy menses and remained anemic, thus, Dr. Chatwani recommended a hysterectomy. *Id.* at 22–23. Thus, based on this record, we cannot conclude that the trial court abused its discretion by permitting evidence of Plaintiff's religious affiliation, which forbids receipt of blood transfusions, as it was relevant in describing the course of Plaintiff's medical treatment. Moreover, Plaintiff fails to explain how the jury's knowledge of her religious affiliation caused prejudice or bias, and there is no indication that the evidence was used to undermine Plaintiff's credibility.

■■■ ¶ 31 With regard to evidence of Plaintiff's uncooperativeness with presurgical treatment options, Plaintiff failed to preserve this issue in her concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). Accordingly, that issue is waived. *Milicic v. Basketball Marketing Co., Inc.,* 857 A.2d 689, 693 (Pa.Super.2004).

■■■ ¶ 32 In her fourth and fifth issues in this appeal, Plaintiff argues that the trial court improperly limited the scope of her cross-examination of two witnesses. In this regard, we note:

attack Plaintiff's credibility; therefore, 42 Pa. C.S.A. § 5902(b) and Pa.R.E. 610 were not applicable.

The scope of cross-examination is within the sound discretion of the trial court, and we will not reverse the trial court's exercise of discretion in absence of an abuse of that discretion. Generally, [e]very circumstance relating to the direct testimony of an adverse witness or relating to anything within his or her knowledge is a proper subject for cross-examination, including any matter which might qualify or diminish the impact of direct examination. Specifically regarding medical experts, the scope of cross-examination involving a medical expert includes reports or records which have not been admitted into evidence but which tend to refute that expert's assertion.

*Boucher v. Pennsylvania Hosp.*, 831 A.2d 623, 629 (Pa.Super.2003) (citations and quotation marks omitted).

■■■ ¶ 33 In her fourth issue, Plaintiff argues that the trial court erred by refusing to allow her to cross-examine the Defendants' OB/GYN expert, Dr. Belford–Budd, with the text, *TeLinde's Operative Gynecology*. As Plaintiff notes, this Court in *Majdic v. Cincinnati Mach. Co.*, 370 Pa.Super. 611, 537 A.2d 334 (1988), set forth the following with regard to use of learned treatises:

The law in this Commonwealth is well-settled that an expert witness may be cross-examined on the contents of a publication upon which he or she has relied in forming an opinion, and also with respect to any other publication which the expert acknowledges to be a standard work in the field. In such cases, the publication or literature is not admitted for the truth of the matter asserted, but only to challenge the credibility of the witness' opinion and the weight to be accorded thereto. Learned writings which are offered to prove the truth of the matters therein are hearsay

and may not properly be admitted into evidence for consideration by the jury. *Id.* at 339 (citations omitted). In *Majdic,* the plaintiff presented a mechanical engineering expert who testified that the power press on which the plaintiff had been injured was defective because of the absence of safety guards. The plaintiff sought to introduce evidence from various trade publications and treatises upon which the expert had relied in forming his opinion. He also sought to introduce evidence of patents to establish that safety guards were available at the time the press had been manufactured. We agreed that the trial court properly refused to admit the treatises and patents because they had been offered to prove the truth of the matter asserted therein, *i.e.,* that safety guards could have been added to the press at the time of its manufacture. We also agreed with the trial court's refusal to allow the expert to read the contents of these documents aloud in court, because doing so would constitute inadmissible hearsay. We stated, "[i]t is the purpose for which the information is offered, not the manner in which [it] is introduced, which makes it objectionable." *Id.* at 340.

¶ 34 In the instant case, the trial court notes that Plaintiff argued that she should have been permitted to cross-examine Dr. Belford–Budd "with information contained in what Plaintiff identified as a learned treatise" because it "would have demonstrated that Dr. Belford–Budd's testimony was contrary to the standard of care reported in the standard work in the field." T.C.O. at 7 (quoting Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for New Trial at 20). Nevertheless, in reliance on *Majdic,* the trial court determined that "Plaintiff sought to introduce the contents of the treatise, not to impeach the doctor's credibility, but rather for the truth of the matter therein; namely, that

the standard of care described in the treatise was the correct one." T.C.O. at 7–8.

¶ 35 In the instant appeal, Plaintiff argues that the trial court erred, and that it should have permitted her to cross-examine Dr. Belford–Budd with the treatise, because Dr. Belford–Budd (1) acknowledged that the treatise was a standard work in the field, and (2) testified to a standard of care that was contrary to that set forth in the treatise.

¶ 36 *Majdic* instructs that use of a learned treatise in these circumstances is proper only when admitted, not for the truth of the matter asserted, but only to challenge the credibility of the witness's opinion and the weight accorded to the witness's opinion. In this respect, we do not follow the trial court's reasoning wherein it first states that Plaintiff sought to introduce information in the treatise to contradict the standard of care testified to by Dr. Belford–Budd, and then inconsistently concludes that Plaintiff sought to introduce the treatise for the truth of the matter asserted therein.

¶ 37 Nevertheless, in her argument to this Court, Plaintiff merely asserts that "[h]ad [P]laintiff's counsel been permitted, she would have demonstrated that Dr. Bellford–Budd's [sic] testimony was contrary to the standard of care reported in the standard work in the field." Plaintiff's brief at 32. Plaintiff's argument fails, however, because she does not indicate what Dr. Belford–Budd stated with regard to the standard of care, and she fails to cite the part of the treatise that she would have used to attack Dr. Belford–Budd's opinion.

■■■ ¶ 38 We note that Plaintiff presented this challenge both to the trial court and in this appeal, in the context of

her request for a new trial. However, we will not reverse the denial of a motion for a new trial "absent a gross abuse of discretion or error of law by the trial court." *Simmons v. Cobb*, 906 A.2d 582, 584 (Pa.Super.2006). As noted above, the decision to admit or exclude evidence is within the sound discretion of the trial court. *Id.* at 585. Indeed, "for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party." *Id.* (citation omitted). Although the trial court may have erred in the instant case by refusing to allow Plaintiff to use the treatise to attack the credibility of Dr. Belford–Budd's testimony on the standard of care, Plaintiff completely fails to establish how the trial court's refusal resulted in prejudice, in that Plaintiff does not even explain what the two allegedly conflicting standards are. She has not, therefore, met her burden of persuading this Court that she was prejudiced to the extent that merits a new trial.[4]

■■■ ¶ 39 Finally, in her fifth issue, Plaintiff asserts that the trial court erred by precluding her from cross-examining Defendants' expert, Dr. Belford–Budd, with regard to previous malpractice suits. In *Yacoub v. Lehigh Valley Med. Assocs., P.C.*, 805 A.2d 579, 592 (Pa.Super.2002) (*en banc*), we acknowledged that "an expert witness can be cross-examined as to any facts that tend to show partiality on the part of the expert[.]" Nevertheless, Plaintiff again fails to establish that any error with regard to this evidentiary ruling resulted in prejudice that would warrant a new trial. *See Yacoub*, 805 A.2d at 586 ("[I]f the basis of the request for a new trial is the trial court's rulings on evidence, then such rulings must be shown to have been not only erroneous but also harmful

---

4. Accordingly, we need not evaluate the parties' dispute with regard to whether Dr. Belford–Budd admitted that the treatise was a standard work in the field or not.

to the complaining party."). In fact, in her brief, Plaintiff essentially admits that she does not know whether Dr. Belford–Budd was ever a defendant in a medical malpractice case. *See* Plaintiff's brief at 35 (indicating that if Dr. Belford–Budd had answered "no" to the question of whether she had ever been a defendant in a malpractice case, then Plaintiff's inquiry would have ended, but if Dr. Belford–Budd had responded "yes" to the question, "then more questioning concerning bias could have been elicited"). Accordingly, Plaintiff fails to persuade us that this purportedly erroneous evidentiary ruling resulted in prejudice so as to warrant a new trial.

¶ 40 Judgment affirmed.

¶ 41 P.J.E. McEWEN files a concurring statement.

### CONCURRING STATEMENT BY McEWEN, P.J.E.:

¶ 1 Since the author of the majority Opinion has, in his usual fashion, undertaken so careful an analysis and provided so perceptive a rationale in support of the ruling to affirm the judgment entered by the trial court, I hasten to join in the Opinion.

¶ 2 I write separately, however, to observe that the Pennsylvania Supreme Court has not yet addressed the principle of law announced by this Court in *Neal by Neal v. Lu,* 365 Pa.Super. 464, 530 A.2d 103 (1987),[5] namely, that a *defense* medical expert can offer opinion testimony without having that testimony subjected to the condition precedent that such opinion be founded upon a reasonable degree of medi-

cal certainty. I proceed to this observation since it strikes me that to enforce this threshold condition to the presentation of retained experts for plaintiffs, while relieving defense experts of compliance with that same restriction, establishes a double standard that runs contrary to the core values of American jurisprudence.

¶ 3 However, since the view expressed by the majority is well supported by current jurisprudence,[6] I join therein.

---

5. It merits emphasis that *Neal by Neal v. Lu,* 365 Pa.Super. 464, 530 A.2d 103 (1987), presented a somewhat unusual factual situation given that the doctor defendant was also the putative expert testifying in his own defense.

6. *See also: Erkens v. Tredennick,* 353 Pa.Super. 236, 509 A.2d 424 (1986), *appeal dismissed,* 516 Pa. 1, 531 A.2d 778 (1987); *Smick v. City of Philadelphia,* 161 Pa.Cmwlth. 622, 638 A.2d 287 (1994), *appeal denied,* 539 Pa. 660, 651 A.2d 546 (1994).