J-A02036-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: CECILIA F. BALOGH, AN ADULT | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: ROBERT F. BALOGH | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 717 WDA 2020 |

Appeal from the Order Entered June 18, 2020
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): 02-19-05069

BEFORE: BOWES, J., NICHOLS, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.: **FILED: July 29, 2021**

Robert F. Balogh ("Son") appeals from the order requiring him to return certain *inter vivos* transfers made to him by his Mother, Cecilia Balogh ("Mother"). We affirm.

Mother initiated this action by filing a petition to require Son to file an accounting as Mother's agent pursuant to a power of attorney she executed in June of 2018. By consent, Son did file an accounting in December 2019, for the period from June 10, 2018 through March 4, 2019. The court conducted a hearing on March 3, 2020, at which the underlying matter under consideration was whether Son had exerted undue influence over Mother. In addition to the testimony of both Mother and Son, Son presented the testimony of First National Bank Vice-President Joann James, who testified regarding her interaction with Mother and Son, during a transaction in which Mother redeemed savings bonds and Son deposited the proceeds into his First

National Bank account. James reported that she did not observe any behavior between the pair that caused her any concern or that would prompt her to halt the transaction. N.T. 3/3/20 at 37-38.

Approximately three months later, the Orphans' Court issued a memorandum opinion and order, which included the following findings of fact:

1. [Mother] moved from her residence in Swissvale to [Son's] residence in Canonsburg in June 2018. (N.T. 03/03/20, p. 7)

2. In [Mother's] Swissvale residence, the sum of approximately $136,000 in cash was found. (N.T. 03103/20, p. 8)

3. On June 9, 2018, [Mother] and [Son] executed a Loan Agreement and Promissory Note ["Loan Agreement"], which was prepared by Gary L. Sweat, Esquire, who is [Son's] attorney. (Exhibit 1) The document provided for [Mother] to lend [Son] the sum of $136,400 for the purpose of constructing a residence in which [Mother], her Husband (Robert C. Balogh), [Son], and [Son's] wife (Diane Balogh) would reside. [Mother] would have a life estate in the residence and the loan would be forgiven upon her death. The document did not contain any repayment terms. [Mother] did not have separate legal representation. (N.T. 03/03/20, p. 8-10)[1]

4. On June 21, 2018, Son and his Wife opened a Money Market account at First National Bank []. On that date, the sum of $136,400 was deposited into said account (Exhibits 2 and 3) (N.T. 03/03/20, p. 10-12)

5. On November 27, 2018, Son and his Wife purchased vacant real property in North Strabane Township, Washington County, for the sum of $42,600. The funds for said purchase were taken from the First National Bank Account [] in the amount of $51,412.48. (Exhibits 4 and 5) (N.T. 03/03/20, p. 12-14)

---

[1] The Loan Agreement contained the following provision, "This Note shall be governed by the laws of the Commonwealth of Pennsylvania, and jurisdiction shall be vested in the Washington County Court of Common Pleas."

6. [Son's] attorney, Mr. Sweat, prepared a Power of Attorney (POA) for [Mother]. She did not meet with the attorney prior to executing the POA, which was prepared at the direction of [Son], and which [Son] explained to [Mother]. She executed the POA, which names [Son] as the Agent, on June 10, 2018. (Exhibit 6) (N.T. 03/03/20, p. 15)

7. On June 30, 2018, [Son] and [Mother] opened a joint bank account at PNC Bank []. [Son] did not deposit any of his own funds in said account. On August 9, 2018, the sum of $6,000 was deposited into the account, which was a check written to [Mother's] Husband from Prudential Annuities. The check was endorsed by [Son], even though it was made payable to his Father. The ending balance of the account was $84,162.29 on November 16, 2018. (Exhibits 16, 17, 18, and 19) (N.T. 03/03/20, p. 16-19)

8. Check [] from PNC Bank Account [] was written to Wilson Architecture for $6,500. The check was for the purpose of obtaining architectural drawings for the residence to be constructed on the North Strabane property. (Exhibits 11) (N.T. 03/03/20, p. 20)

9. On August 17, 2018, [Son] assisted [Mother] with redeeming 359 US Savings Bonds at First National Bank, which was the bank that he used routinely. The funds from the redeemed bonds, with a value of approximately $65,000, were deposited into [Son] and his Wife's First National Bank Account []. (Exhibits 12 and A) (N.T. 03/03/20, p. 20-21).

10. [Mother's] Husband, who is [Son's] Father, passed away on August 19, 2018.

11. [Mother] transferred her vehicle to [Son's] Wife. (N.T. 03/03/20, p. 21)

12. [Son] arranged for his attorney, Mr. Sweat, to prepare a new Will for [Mother]. The Will provides for [Son] to receive one hundred percent (100%) of the residuary estate and for him to be the Executor. (Exhibit 13) (N.T. 03/03/20, p. 22)

13. [Mother] agreed to move in with [Son], as her daughters did not agree for her to live with them. (N.T. 03/03/20, p. 25)

14. [Mother] does not recall discussing the loan document with [Son]. (N.T. 03/03120, p. 27)

15. [Mother] did not give the US Savings Bonds to [Son] as a gift. She gave them to him 'to hold.' (N.T. 03/03/20, p. 27)

16. The residence being built on the North Strabane Township land is not complete. (N.T. 03/03/20, p. 46)

17. [Mother] has moved from [Son's] residence to Beatty Pointe Independent Living. (N.T. 03/03/20, p. 46)

18. [Mother] never had an account at First National Bank. (Stipulation) (N.T. 03/03120, p. 51)

Orphans' Ct. Memorandum Op. ("Mem. Op."), 6/18/20, at 1-4.

In light of the foregoing, the court found that Son exerted undue influence over Mother because the parties had a "confidential relationship", Mother had given a significant amount of her net worth to Son and Mother suffered a "weakened intellect" due to her circumstances after the loss of her husband. Accordingly, in its June 18, 2020 order, the court directed:

(1) The Loan Agreement and Promissory Note dated June 9, 2018 is deemed void;

(2) [Son] shall remit to [Mother] the sum of $136,400 within sixty (60) days;

(3) [Son] shall remit to [Mother] the total sum deposited into First National Bank Account in the approximate amount of $65,000, from the redemption of US Savings Bonds on August 17, 2018, within sixty (60) days;

(4) Any funds remaining in PNC Bank Account or withdrawn by [Mother] shall be the sole and separate property of [Mother];

(5) The vehicle transferred by [Mother] to [Son's] wife is not void; and

(6) [Son] and his wife shall retain the real property, including the partial construction, located in North Strabane Township, per Deed dated November 27, 2018.

Orphans Ct. Order, 6/18/20.

- 4 -

Son filed the instant timely appeal and both Son and the Orphans' Court complied with Pa.R.A.P. 1925. Son raises the following issues for review:

1) Whether the trial court erred when it failed to consider whether [Mother], proved by clear and convincing evidence, that she suffered from a weakened intellect and therefore experienced undue influence?

2) Whether the trial court erred in considering [Mother's] lack of memory while testifying at trial when determining whether [Mother] suffered from a weakened intellect for events that transpired 20 to 22 months earlier and after [Mother] had suffered an intervening head injury?

3) Whether the trial court abused its discretion when it weighed the evidence in favor of [Mother] when determining that [Mother] and [Son] satisfied their respective burdens of proof under the law?

4) Whether the trial court erred in precluding testimony from Joann James, the Vice-President and Branch Manager of First National Bank at the time in question, who witnessed and interacted with [Mother] and [Son] on the day [Mother] negotiated the savings bonds at First National Bank, when Ms. James testified regarding her observations of [Mother] and [Son] on the day in question?

5) Whether the Trial Court erred and/or abused its discretion when it failed to enforce the forum selection clause in the loan agreement and promissory note, overruling [Son's] counsel's objection, after the legitimacy of the loan agreement and promissory note was first called into question and the issue was raised at trial?

Son's Br. at 5-6.

Son's first three issues all concern his underlying contention that the Orphans' Court erroneously found that Mother established a *prima facie* case of undue influence by clear and convincing evidence. We will consider these issues together. Son takes specific exception with the court's finding that Mother suffered from a weakened intellect. He argues that Mother executed

the Loan Agreement prior to moving in with him and his wife and that no other evidence, medical or otherwise, was presented regarding Mother's alleged weakened intellect. According to Son, Mother's forgetfulness at trial cannot reflect on her intellect at the relevant time because in the intervening months she suffered a head injury. To the contrary, Son asserts that his rebuttal evidence showed that Mother was clear-headed. He further points out that Bank Vice-President James testified that she suspected nothing amiss between Mother and Son, and if she had, she would have stopped the transaction immediately.

Conversely, Mother asserts that the court erroneously applied a more stringent standard for undue influence than required. She explains that the court improperly applied the standard for testamentary transfers but the transfers at issue here consisted of alleged *inter vivos* gifts. Hence, according to Mother, in order to make a *prima facie* case for undue influence she only needed to establish that a confidential relationship existed between herself and Son, and upon that showing, the burden should have shifted to Son to prove that Mother was of sound mind and not subject to undue influence. Mother emphasizes that she properly established that a confidential relationship existed between herself and Son because she lived with Son, Son was her agent under her POA, and she generally depended on Son to manage her financial affairs.

Furthermore, Mother maintains that Son failed to carry his burden of proving that no undue influence occurred. According to Mother, Son failed to

present any testimony that Mother intended to give him the majority of her net worth, except for his own self-serving testimony. She avers that the court properly concluded that Vice-President James' testimony regarding her single limited interaction with Mother and Son could not establish that Son did not exert undue influence over Mother. Mother also points out that Son's own attorney was the sole author of the documents at issue and she was unrepresented when she executed the documents.

We review the Orphans' Court's factual findings for an abuse of discretion, and its legal conclusions for an error of law. **Owens v. Mazzei**, 847 A.2d 700, 706 (Pa.Super. 2004). "Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of discretion." **Id.** (quoting **In re Estate of Harrison**, 745 A.2d 676, 678 (Pa.Super. 2000)) (brackets omitted). "If the court's findings are properly supported, we may reverse its decision only if the rules of law on which it relied are palpably wrong or clearly inapplicable." **Id.** (quoting **Harrison**, 745 A.2d at 678-79).

First, Mother is correct that the undue influence standard the Orphans' Court applied was erroneous because it is applicable to testamentary rather than *inter vivos* transfers. The testamentary standard requires the contestant to a will first to present a *prima facie* case showing three things: (1) the testator and defendant were in a confidential relationship; (2) the testator bequeathed the defendant a substantial portion of his or her estate; and (3) the testator was of weakened intellect. **In re Clark's Estate**, 334 A.2d 628,

632 (Pa. 1975) ("**Clark's I**"); **Estate of Lakatosh**, 656 A.2d 1378, 1383 (Pa.Super. 1995). Once the contestant has presented a *prima facie* case of these elements, the burden shifts to the defendant to prove, by clear and convincing evidence, that the will provision was not the product of undue influence. **Clark's I**, 334 A.2d at 632; **Lakatosh**, 656 A.2d at 1383.

However, a challenge to a transfer made during an individual's lifetime, such as the transfers at issue here, is subject to a different standard. The challenger need only establish, by clear and convincing evidence, a single thing: that the donor and donee were in a confidential relationship. If the challenger carries that burden, the burden then shifts to the donee to "prove affirmatively that it is unaffected by any taint of undue influence, imposition, or deception." **McCown v. Fraser**, 192 A. 674, 676 (Pa. 1937).[2] The donee must carry this burden to disprove undue influence with clear and convincing evidence. **See In re Novosielski**, 992 A.2d 89, 94 n.4 (Pa. 2010) (citing **Estate of Buriak v. Sperl**, 492 A.2d 1166, 1168 (Pa.Super. 1985)).

A challenger to an *inter vivos* gift claiming undue influence bears no burden of showing that the donor had a weakened intellect. Rather, an *inter vivos* gift to one in a confidential relationship with the donee "will be condemned, even in the absence of evidence of actual fraud, **or of mental**

---

[2] **Accord Banko v. Malanecki**, 451 A.2d 1008, 1010 (Pa. 1982); **Hera v. McCormick**, 625 A.2d 682, 690 (Pa.Super. 1993); **see also In r Clark's Estate**, 359 A.2d 777, 781 (Pa. 1976) ("**Clark's II**") (stating burden shifts to donee to "affirmatively show that the gift was the free, voluntary and intelligent act of" the donor).

**incapacity on the part of the donor**, unless there is full and satisfactory proof that it was the free and intelligent act of the donor, fully explained to him, and done with a knowledge of its consequences." ***McCown***, 192 A. at 676-77 (emphasis added); ***see also Burns v. Kabboul***, 595 A.2d 1153, 1162-64, 1171 (Pa.Super. 1991) (deciding both types of claims under different standards). The reason that a party contesting a will must prove the testator suffered from weakened intellect in order to assert undue influence claim is that "[a] testator's interest in his property necessarily terminates at death," and therefore "the law does not view a testamentary disposition with so suspicious an eye." ***McCown***, 192 A. at 677. In contrast, one challenging an *inter vivos* gift need not establish weakened intellect because "it is opposed to the common experience of mankind for one yet alive and able to enjoy his property to divest himself of a substantial part of his estate voluntarily and without consideration." ***Id.***

A confidential relationship exists where "the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed." ***Owens***, 847 A.2d at 709. "[I]t is marked by such a disparity in position that the inferior party places complete trust in the superior party's advice and seeks no other counsel, so as to give rise to a potential abuse of power." ***Wisniski v. Brown & Brown Ins. Co. of PA***, 906 A.2d 571, 577 (Pa.Super. 2006) (citation omitted). Certain types of relationships, such those involving a power of attorney, are indicative, but not dispositive,

of the existence of a confidential relationship, which is a question of fact. **See In re Estate of Smaling**, 80 A.3d 485, 498-99 (Pa.Super. 2013) (*en banc*); **In re Estate of Fritts**, 906 A.2d 601, 608-609 (Pa.Super. 2006).

In this case, the Orphans' Court properly concluded that a "confidential relationship" existed between Mother and Son at the time of the transfers at issue. Mother moved in with Son when her husband was very ill. She had depended on her husband entirely financially, having had not worked outside the home. Further, Mother never drove a vehicle. Thus, Mother depended on Son for housing, financial guidance, and for transportation. Furthermore, Mother executed a POA in June 2018 naming Son as her agent. The record thus amply supports the court's finding that Mother and Son had a confidential relationship. **See Wisniski**, 906 A.2d at 577; **McCown**, 192 A. at 676; **Smaling**, 80 A.3d at 498-99; **Fritts**, 906 A.2d at 608-609.

Accordingly, under the *inter vivos* undue influence analysis, which was properly applicable here, the burden fell on Son to demonstrate a lack of undue influence. **See McCown**, 192 A. at 676-77; **Clark's II**, 359 A.2d at 780. Son claims that his testimony regarding Mother's alleged upset with her daughters should have been sufficient to establish that Mother gifted a significant portion of her assets to him in light of that upset, rather than due to any undue influence on his part. Son also points to Bank Vice-President James' testimony, wherein she explained that she did not notice anything amiss between Mother and Son while she assisted Mother in the redemption of saving bonds.

However, the court did not find that the testimony of either Son or James credibly established that Son did not exert undue influence on Mother. The court specifically found as facts that Mother suffered from a weakened intellect due to the trauma she experienced by moving away from her husband, who had always handled her finances, and away from her long-time residence. **See** Orphans' Ct. Memorandum Op., at 5; Orphans' Ct. Rule 1925(a) Op., at 6.

The court thus found that the parties were in a confidential relationship and rejected Son's rebuttal evidence that the transactions were not the result of undue influence. **See** Mem. Op. at 6-7. We discern no abuse of discretion. **See Owens**, 847 A.2d at 706. In his reply brief, Son argues that if this Court applies the *inter vivos* standard of analysis for undue influence, we should then remand this matter to the Orphans' Court to provide him with the opportunity to meet his burden of proving that Mother's transfers were not the result of any undue influence. However, Son already had that opportunity. Although the orphans' court applied the testamentary standard, both that standard and the *inter vivos* standard afford the party charged with exerting undue influence the opportunity to prove that there was no undue influence, by clear and convincing evidence. The orphans' court here gave Son such a chance but found that Son had failed to carry his burden. Hence, Son's first three issues warrant no relief.

We respectfully disagree with the Concurring and Dissenting Memorandum that the evidence did not establish a confidential relationship at

the time Mother signed the Loan Agreement because she had not yet signed the POA. We are reviewing for an abuse of discretion and whether the parties had a "confidential relationship" is fact-sensitive and subject to the trial court's weight and credibility determinations. *Smaling*, 80 A.3d at 498-99; *Fritts*, 906 A.2d at 608-609. While it is true that Mother signed the Loan Agreement before she executed the POA, the POA is simply not dispositive of this issue, but rather is just one piece of evidence that a court may use to find, as a question of fact, that there was (or was not) a confidential relationship. In point of fact, Mother executed the Loan Agreement **only one day before** the POA and she moved into Son's home only a short while later. The other events at issue, which the Concurring and Dissenting Memorandum agrees were subject to Son's undue influence, occurred within approximately two months of Mother's execution of the Loan Agreement. What is more, the only testimony Son offered to rebut the undue influence claim regarding the Loan Agreement was his own self-serving testimony, which the trial court did not credit. *See Owens*, 847 A.2d at 706. We do not think that, under these facts, the court abused its discretion in concluding that the confidential relationship did not spring to life when Mother executed the POA, but rather existed the day before.

Turning to Son's fourth issue, Son contends that the Orphans' Court erred by not allowing Bank Vice-President James to testify as an expert. He argues the court should have permitted her to do so, given her training and experience with the mental capacity of banking customers. In the alternative,

Son maintains that the court erred by failing to delineate the portion of James' testimony that constituted permissible opinion testimony. Son points to the following exchange during the March 3, 2020 hearing:

[Son's counsel] Do you recall how long it took to process all those bonds that day?

[James] My best estimate would be an hour to an hour and a half.

[Son's counsel] As a branch manager do you receive training in assessing capacity, undue influence, duress, anything like that in a transaction of this type?

[James] Yes. We would receive training yearly.

[Son's counsel] If you detected that something was off in the transaction, what would you do?

[James] We would end the transaction. I probably would have separated [Mother] from [Son] and had a private conversation with her on how she wanted to proceed.

[Son's counsel] During this transaction is it safe to say that you never had any indication, based on your training, that there was a dynamic at play other than [Mother] acting on her own behalf?

[James] Yes. I did not detect anything going on.

[Mother's counsel] Your Honor, I'm going to object because we're getting into an area of expert [testimony], and I don't think that the bank manager's an expert on capacity.

THE COURT: All right. I'll sustain the objection. This is one of the recommendations by the Elder Law Task Force, by the way, that the entire banking business participate in a meaningful way with the detection of people who are being taken advantage of. And the bank business industry – I guess bank industry business is the way to go -- chose not to participate. They did not want to go anywhere near this issue, but they did concede that individual managers could talk to people they know and see if there's some overt thing. But she can't testify as an expert.

[Son's counsel]: And I'm not asking –

THE COURT: I understand, but we're drifting in and out.

- 13 -

N.T., 3/3/2020, at 37-38.

"The law is well settled that decisions regarding admission of expert testimony, like other evidentiary decisions, are within the sound discretion of the trial court. We may reverse only if we find an abuse of discretion." *Renna v. Schadt*, 64 A.3d 658, 664 (Pa.Super. 2013) (citations omitted). "In addition, [t]o constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *Jacobs v. Chatwani*, 922 A.2d 950, 960 (Pa. Super. 2007) (citation omitted).

The Pennsylvania Rules of Evidence provide that "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is (a) rationally based on a witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge..." Pa.R.E. 701. Moreover, an expert's testimony must be "based on more than mere personal belief," and "must be supported by reference to facts, testimony or empirical data." *Snizavich v. Rohm & Haas, Company*, 83 A.3d 191, 195 (Pa. Super. 2013) (citations omitted).

In the instant case, the Orphans' Court concluded that Bank Vice-President James was not qualified to offer expert testimony regarding Son's relationship with Mother, especially considering the single, limited interaction James observed. Once again, we discern no abuse of discretion. *See Snizavich*, 83 A.3d at 195; *Renna*, 64 A.3d at 664. Moreover, the court did allow James to provide lay testimony regarding her personal observations and

impressions of Mother. **See** Pa.R.E. 701. James explained that she did not observe anything amiss between Mother and Son and therefore did not preclude Mother from redeeming her bonds in favor of Son. Thus, even if the court's decision to preclude James from testifying as an expert was error, Son was not prejudiced as James did testify regarding her observations and impressions of the relationship between Mother and Son. **See Jacobs**, 922 A.2d at 960. Therefore, Son's fourth issue also lacks merit.

Turning to Son's final issue, he asserts that the Orphans' Court erred by failing to enforce a forum selection clause set forth in the Loan Agreement. Son argues that the court erroneously failed to sustain his objection at trial challenging the court's jurisdiction to hear any matter regarding the Loan Agreement given the document's forum selection clause, which designated Washington County as the proper venue. Son maintains that he did not raise his objection to venue via preliminary objection because he believed that Mother's action only sounded in conversion and did not involve the Loan Agreement specifically. However, the court concluded that Son waived his objection to venue by failing to raise it prior to trial.

A court with jurisdiction, and in which venue is proper, should decline to entertain a suit if the parties have freely agreed to conduct litigation in another forum, so long as the agreement to do so is not unreasonable*. Autochoice Unlimited, Inc. v. Avangard Auto Fin., Inc.*, 9 A.3d 1207, 1215 (Pa.Super. 2010) (citation omitted). However, the Pennsylvania Rules of Civil Procedure

state that "[i]mproper venue shall be raised by preliminary objection and if not so raised shall be waived." Pa.R.C.P. 1006(e).

In this case, the court properly found Son's claim regarding improper venue to be waived because Son failed to raise his contention in a preliminary objection. *See* Pa.R.C.P. 1006(e). Moreover, Son's claim that he did not anticipate the Loan Agreement being at issue in this case prior to trial is belied by the record. In his initial filing, Son presented argument regarding the Loan Agreement and attached the document to his filing. *See* Son's Answer and New Matter, dated 9/13/19. Further, Son admits that Mother raised the "legitimacy" of the Loan Agreement in a pretrial statement. *See* Son's Br. at 45. Thus, contrary to the reasoning set forth in the dissent, we conclude that Son had reason to know that the Loan Agreement was at issue in this case and was thereby required to file a preliminary objection to alert the trial court to any objection to venue prior to the start of trial. Pa.R.C.P. 1006(e). Hence, we conclude that the court did not err by finding Son's venue claim waived for failure to raise it in a preliminary objection. In any event, son's alleged misunderstanding of Mother's claim would not excuse waiver here. We affirm the Orphans' Court's order.

Order affirmed.

Judge Nichols joins the memorandum.

Judge Bowes files a concurring/dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  7/29/2021