J-A21006-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| GARY CHIODETTI | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| DR. EUGENE FERNANDES | |
| Appellee | No. 63 EDA 2013 |

Appeal from the Judgment Entered November 15, 2012
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): April Term, 2009; #0040

BEFORE:  BOWES, J., OTT, J., and STRASSBURGER, J.[*]

MEMORANDUM BY OTT, J.:                    **FILED FEBRUARY 06, 2015**

Gary Chiodetti appeals from the judgment entered in the Court of Common Pleas of Philadelphia County in favor of Dr. Eugene Fernandes, M.D., in this action for professional negligence.  Chiodetti claimed Dr. Fernandes' negligence in injecting local anesthesia prior to eye surgery caused him blindness in his right eye.  A jury determined Dr. Fernandes had not breached the standard of care in administering the injection.  In this timely appeal, Chiodetti raises five issues.  He argues the trial court erred in denying his post-trial motions, claiming trial court error in: (1) preventing Chiodetti's expert from testifying regarding a peer-reviewed article he had authored; (2) permitting defense expert, Dr. Nicholas T. Iliff, M.D. to testify

---

[*] Retired Senior Judge assigned to the Superior Court.

beyond the scope of his report, as well as presenting cumulative testimony; (3) precluding him from arguing at closing that Dr. Fernandes had failed to call a witness; (4) failing to preclude the use of trial exhibits that had not been supplied to Chiodetti prior to trial; and (5) failing to preclude defense expert, Dr. Jay S. Duker, M.D., from testifying when he was not timely identified as a witness. After a thorough review of the submissions by the parties, relevant law, and the certified record, we affirm.

"Our standard of review [of an order] denying a motion for a new trial is to decide whether the trial court committed an error of law which controlled the outcome of the case or committed an abuse of discretion." **Cangemi ex rel Estate of Cangemi v. Cone**, 774 A.2d 1262, 1265 (Pa. Super. 2001) (citation omitted).

Because Chiodetti's claims of error involve evidentiary rulings,[1] we also note:

> When we review a trial court ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party.
>
> An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result

_____

[1] Chiodetti's third claim, regarding his preclusion from making an adverse inference argument in his closing, is best explained as an evidentiary ruling as well.

of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.

***Phillips v. Lock***, 86 A.3d 906, 920 (Pa. Super. 2014) (citation omitted).

Similarly, our standard of review regarding the admission of expert testimony is:

> Decisions regarding admission of expert testimony, like other evidentiary decisions, are within the sound discretion of the trial court. We may reverse only if we find an abuse of discretion or error of law.

***Cimino v. Valley Family Medicine***, 912 A.2d 851, 953 (Pa. Super. 2006) (citation omitted).

We adopt the relevant factual and procedural history as related in the trial court's Pa.R.A.P. 1925(a) opinion.[2]

> On April 13, 2007, twenty-six-year-old Chiodetti presented at the Frankford-Torresdale Emergency Room with injuries sustained when he was assaulted in his neighborhood. A CT scan revealed a displaced fracture of the orbit surrounding his right eye, an injury referred to as an "orbital blow-out fracture." He was admitted with a diagnosis of closed orbital floor, nasal fractures and facial lacerations, and was placed in the care of Dr. Fernandes. On April 15, 2007, Dr. Fernandes operated on Chiodetti's right eye to repair the orbital fracture. On April 17, 2007, Chiodetti experienced loss of vision in that eye. On April 24, 2007, Chiodetti learned that the loss of sight in his right eye is permanent.
>
> On April 6, 2009, Chiodetti filed a complaint against Dr. Fernandes and Frankford Hospital alleging that the blindness in his right eye resulted from Dr. Fernandes' negligence in inadvertently injecting local anesthesia into Chiodetti's eyeball

---

[2] The opinion was authored by the Honorable Mary Colins, in lieu of the trial judge, the Honorable Gary DiVito, who retired.

- 3 -

rather than into the surrounding orbit. The defendants denied all claims of negligence. Defendant Frankford Hospital was dismissed from the case on July 12, 2011, a few days before trial.

Judge DiVito denied Chiodetti's motion *in limine* to preclude documents that Chiodetti claims were never provided to him. *See* Order of July 14, 2011 (Control No. 10070081), April Term, 2009, No. 0040. On July 18, 2011, the first day of trial, the Judge heard argument on Chiodetti's two other motions *in limine* regarding expert testimony. He denied Chiodetti's motion to preclude the evidence and testimony of Jay S. Duker, M.D., a retinal expert, on the ground that he found that Chiodetti suffered no prejudice as a result of Fernandes' late retention of the expert originally retained by the now-dismissed hospital defendant.[3] Judge DiVito denied Chiodetti's motion to preclude evidence from Nicholas T. Iliff, M.D., eye surgeon, on the same grounds, namely lack of prejudice.

Chiodetti's expert, Marvin F. Kraushar, M.D., an ophthalmologist with a specialty in the retina, testified that the standard of care when administering anesthesia to the eye requires a surgeon to verify the location of the needle by moving it in such a way to ensure that its tip is not inside the eyeball itself before injecting the medication. He opined that since Dr. Fernandes did not use this method – referred to in the case as "wiggling" the needle – he inadvertently injected anesthesia into the eye and that the pressure from this additional fluid cut off the blood flow to the retina, causing Chiodetti's blindness. During Dr. Kraushar's testimony, Judge DiVito sustained an objection on hearsay grounds from defense counsel to testimony that an article authored by Dr. Kraushar was peer reviewed.

Dr. Fernandes testified on his own behalf and denied that he perforated the globe (eyeball) or that his injection method fell below the standard of care. Dr. Fernandes presented the

---

[3] Judge DiVito was incorrect in stating Dr. Duker had been previously retained by Frankford Hospital; Drs. Iliff and Nicholas Volpe were Frankford's experts. However, Dr. Duker specifically adopted Dr. Volpe's conclusions. **See** Duker Report, 4/18/2011, at 3, discussed on pages 21-22. Accordingly, the opinion did not change from one expert to the next.

testimony of two experts. The first of these was Jay S. Duker, M.D., an ophthalmologist specializing in medical and surgical treatment of the retina. Dr. Duker concluded that upon review of all the pertinent records that Dr. Fernandes administered anesthesia to Chiodetti properly. Further, he rejected Dr. Kraushar's articulation of the standard of care – "wiggling" the needle to verify that it had not perforated the globe – stating, "[t]hat's a particularly bad idea" that it is based on procedure long ago recognized as presenting unacceptable risk of injury. He also said that it was "highly unlikely" that Dr. Fernandes actually perforated the globe.

Dr. Fernandes' other expert, Nicholas T. Iliff, M.D., is an occuplastic eye surgeon (a surgeon who addresses "problems around the eye that includes some of the difficulties right on the surface of the eyes, but particularly trouble with the eyelids, the bones around the eyes, the tear drain system, the tissues behind the eyes.") Dr. Iliff testified that Dr. Fernandes met the standard of care by directing the needle toward the bone of the orbit, away from the globe in order to reduce risk of perforation. Like Dr. Duker, Dr. Iliff testified that Dr. Kraushar's proposed "wiggle" method is not the standard of care and that it is a method that poses undue risk of injury. Dr. Duker also testified extensively on the possible other causes of [] Chiodetti's blindness, many of which could not conclusively be ruled out.

…

During closing argument, the judge sustained [Fernandes'] objection to Chiodetti's attorney's reference to Dr. Fernandes' failure to present the testimony of Dr. Arunan Sivalingam, Chiodetti's treating doctor at Wills Eye Hospital, despite Dr. Fernandes' counsel's apparent promise during openings to do so. The Judge did not offer the basis for his ruling.

Trial Court Opinion, 3/24/2014, at 2-5 (citations to record and footnote omitted).

Based on the foregoing, Chiodetti's first claim is that the trial court erred in precluding his expert, "Dr. Marvin Kraushar, M.D. from testifying that an article he wrote, establishing the standard of care, had been peer

reviewed and published[.]" Chiodetti's Brief at 5. Although we believe the trial court's ruling was not thoroughly explained, we agree with the result.

On July 18, 2011, during direct examination, Dr. Kraushar was asked to comment upon a paper he co-authored with two other doctors in 1995. The title of the paper was "Prevention of Accidental Intraocular Injection Following Inadvertent Needle Perforation of the Eyeball." *See* N.T. Trial 7/16/2011, at 152. After Dr. Fernades' counsel objected to the introduction of the article, this discussion took place at sidebar:

> [Dr. Fernandes' Counsel]: First off, Pennsylvania is not adopting the treatise exception to the hearsay rule.
>
> Secondly, this is clearly bolstering the witness' testimony. We're on direct examination.
>
> [Chiodetti's Counsel]: This is about establishing standard of care for the doctor. This article is exactly about his peer reviewed article, 1995, this procedure, it talks about it. So unless they're going to agree this is the standard of care, it's a peer reviewed article establishing the standard of care.
>
> THE COURT: I don't have a problem about an article he wrote, he wrote an article about the subject –
>
> [Chiodetti's Counsel]: It's not just something he wrote, not just him putting it out there –
>
> THE COURT: It's hearsay because you cannot cross-examine on the peer review.
>
> [Chiodetti's Counsel]: But it's not just him –
>
> THE COURT: No.
>
> [Chiodetti's Counsel]: - his colleague said it's accepted.
>
> THE COURT: I will not allow it.

- 6 -

N.T. Trial, 7/18/2011, at 151-152.

The trial court's ruling was based on the fact that the peer reviewers were not available for cross-examination.[4] This presumes that the declarants, as referred to in the definition of hearsay,[5] were the peer reviewers, not the authors of the article, one of whom was Dr. Kraushar who was assuredly available for cross-examination. This presumption is confirmed by Chiodetti's counsel's previously quoted argument that the peer reviewed article, describing the technique testified to by Dr. Kraushar, established the standard of care. Therefore, the truth of the matter asserted was that the peer review certified the described technique as the standard of care.

In this context, the trial court's ruling prohibiting reference to the peer review as hearsay was correct. Those who purportedly certified the procedure as the standard of care were unavailable to testify as to the basis of their conclusion.

_____

[4] We note the trial court did not sustain the objection on the basis of the lack of a hearsay exception for learned treatises. **See Ohlbaum on the Pennsylvania Rules of Evidence**, § 703.14.

[5] **See** Pa.R.E. 801, defining hearsay in relevant part as a statement that he declarant does not make while testifying at the current trial and which is offered to prove the truth of the matter asserted in the statement.

Additionally, because of the terseness of the trial court's ruling peer review was hearsay,[6] we also find that even if the trial court erred in precluding the proposed testimony, it was harmless error.

The definition of standard of care has recently been discussed by our Supreme Court:

> …the standard of care of physicians in Pennsylvania was an objective one. That is, "physicians must have and employ the same skill and knowledge typically used by physicians in the medical profession, and must keep themselves informed of contemporary developments in the profession."

*Passarello v. Grumbine*, 87 A.3d 285, 298 (Pa. 2014) (citation omitted).

Further,

> The Committee [on Proposed Standard Civil Jury Instructions] established a basic instruction for a physician's standard of care in a medical malpractice case that remains in effect today: "A physician must have the same knowledge and skill and use the same care normally used in the medical profession. A physician whose conduct falls below this standard of care is negligent." Pa. SSJI (Civ) 14.10 (4th ed. 2011).

*Id*.

Accordingly, standard of care is established by evidence of the general standards of care, skill, and knowledge employed by similar medical professionals. Dr. Kraushar testified extensively regarding the standard of care. The jury heard his opinion and the basis for that opinion. The jury

_____

[6] Because argument on this issue was cut off, the record may not be fully developed as to the offered meaning of peer review. We believe peer review may be better described as confirmation that the peer reviewed article conforms to proper scientific methodology rather than as certification of the accuracy of the conclusions of the article.

heard that he had published a book on the treatment of eyes including the topic at issue, had been invited to speak at a variety of medical conferences on the topic, and currently used the procedure he advocated in his own practice at the Scheie Eye Institute. The jury was adequately informed of Dr. Kraushar's opinion regarding the standard of care and we cannot discern how prejudice accrued from the inability to testify that he had published a peer reviewed article on the procedure. Even accepting for the sake of argument, that there was error in completely prohibiting Dr. Kraushar from referencing his article, Chiodetti suffered no prejudice.[7]

In light of the foregoing, Chiodetti is not entitled to relief on this issue.

Chiodetti's second claim is that the trial court erred in permitting defense expert Dr. Nicholas Iliff, to present cumulative testimony and to testify beyond the scope of his report.[8] We will address the second aspect of this issue first.

_____

[7] The fact that the article did not, by itself, set the standard of care, should not necessarily have prevented Dr. Kraushar from referencing the fact that he had written a published article on the very subject at issue in the trial. The trial court was willing to allow the doctor to say he had published an article. As long as there was no attempt to assert extra meaning to the article, a general prohibition against referencing the article appears to be overbroad. There would be no obvious prohibition from informing the jury about Dr. Kraushar's peer reviewed article when describing his credentials as an expert witness.

[8] In his brief, Chiodetti also argues he sought to preclude Dr. Iliff from testifying on the basis of unfair surprise, namely, Dr. Fernandes had not previously named Dr. Iliff as an expert witness. Dr. Iliff was known to
*(Footnote Continued Next Page)*

We agree with Chiodetti that Dr. Iliff testified beyond the scope of his report when he changed his opinion regarding the causation of Chiodetti's blindness. However, the jury determined that Dr. Fernandes had not been negligent; therefore, in general, any error regarding causation would not affect the verdict. **See Lykes v. Yates**, 77 A.3d 27, 33 (Pa. Super. 2013) (where jury in medical negligence case finds no negligence, errors regarding causation will not affect verdict).

Nonetheless, it is possible that theories of negligence can overlap into causation. Therefore, we must examine the nature of standard of care testimony provided at trial to insure the improper aspects of Dr. Iliff's testimony did not support the negligence testimony, and, as such, affect the verdict.

_(Footnote Continued)_ ————————

Chiodetti because he was named as one of Frankford Hospital's witnesses. Chiodetti claims he preserved the claim of unfair surprise in his motion _in limine_, filed 6/30/2011. **See** Chiodetti's Brief, at 17. The motion _in limine_ only objects to the alleged cumulative nature of Dr. Iliff's proposed testimony. Because the motion _in limine_ was filed prior to Frankford Hospital being released from the case, he could not have argued surprise therein. The issue of surprise was raised orally on the morning of trial, and Judge DiVito allowed Dr. Iliff to testify because the substance of his proposed testimony was known to Chiodetti and so there would be no prejudice. Chiodetti has not developed this aspect of the claim, and so we consider it waived. **See Coulter v. Ramsden**, 94 A.3d 1080, 1088-89 (Pa. Super. 2014) ("arguments which are not appropriately developed are waived" and "[m]ere issue spotting without analysis or legal citation to support an assertion precludes our appellate review of [a] matter.") Moreover, we discern no abuse of discretion in Judge DiVito's ruling.

Chiodetti's expert, Dr. Marvin F. Kraushar, testified that Dr. Fernandes' treatment fell below the accepted standard of care when, during the administration of local anesthesia, he failed to use the "wiggle maneuver" of ensuring the needle tip was not within the orb of the eye, and thereafter injecting the anesthetic solution into the eye, rather than next to the eye. Specifically, Dr. Kraushar testified:

> Once the needle is in the orbit and where the needle is supposed to be outside the eye, it doesn't take very much time to move the syringe like this or like this (witness indicating). And you'll see that the eye moves, that tells you you're in the eye, and you don't want to do that.
>
> And that's all it takes, a couple seconds to do this, a couple seconds to do that, you're not moving the eye around. It's just a like a little – you go like this, like this, and then like this, and you know you're not in the eye, then you can give the injection.
>
> If that moves with you, you know you're in the eye and you have to pull the needle out and get a retina doctor to examine that patient to make sure you haven't torn the retina.
>
> * * *
>
> It is an accepted risk of giving this type of injection to a patient and accidentally sticking the needle in the eye.
>
> What is unacceptable is not knowing that the needle is in the eye before you give the injection, and that could be avoided by such a simple maneuver to avoid complications, okay.

N.T. Trial, 7/18/2011, at 135-37.

On cross-examination, Dr. Kraushar admitted that the wiggle method was not the only standard of care for the administration of anesthesia via

injection and that Dr. Fernandes' expert, as well as an accepted group of other doctors, supported this contrary belief.

Q: You're aware that he [Dr. Duker, one of Dr. Fernandes' expert witnesses] has issued a report in this case in which he opines Doctor Fernandes used the appropriate technique to give the local anesthesia, correct, sir?

A: Yes.

Q: You are also aware that in response to your report, you further – he issued a – strike that.

You're aware of Doctor Iliff from Baltimore, the Wilmer Institute --

A: Yes.

Q: - has also written a report, reviewed in this case, indicating Doctor Fernandes used the appropriate technique and met the standard of care, sir? You are aware of that, correct sir?

A: Yes.

Q: You're aware that Doctor Iliff also issued a report that said your so-called wiggle maneuver is not the standard of care, correct, sir?

A: Yes.

Q: Dr. Iliff had said specifically, the wiggle maneuver is not the standard of care. You're aware of that, sir?

A: Yes.

Q: You're aware that there are ophthalmologists out there who opine the wiggle maneuver is not the standard of care, correct, sir?

A: Yes.

Q: Would you say there is an accepted group of doctors out there who would opine your wiggle maneuver is not the standard of care?

A: Yes.

Q: There is a school of thought out there that the wiggle maneuver is not the standard of care, correct, sir?

A: I can't keep answering yes to all these questions without being able to qualify them.

Q: Well –

A: I'll be happy to answer your question, but I can't keep saying yes without –

THE COURT: Doctor, your counsel will have the opportunity to redirect.

A: Okay. Yes.

*Id*. at 209-11.

The jury's verdict that Dr. Fernandes did not breach the standard of care is fully supportable by this admission alone. Although Dr. Kraushar attempted to qualify his response regarding any other appropriate standard of care, he did not do so on redirect. Therefore, Dr. Kraushar's testimony indicated there were other methods of properly injecting local anesthesia without identifying what those methods were or how Dr. Fernandes violated those standards. That void in evidence was filled by Dr. Fernandes' experts' testimony.

Dr. Fernandes produced two experts who gave similar opinions regarding the applicable standard of care. First, Dr. Jay S. Duker, provided

specific testimony on the procedure Dr. Fernandes used to inject the local anesthesia and why that procedure met the standard of care. ***See*** N.T. Trial, 7/20/2011, at 26-36. Dr. Duker was then asked to comment upon the wiggle maneuver.

> Q: Doctor, we've heard from plaintiff's expert that when administering the local anesthesia, after the doctor puts the needle to a location where he wants to administer anesthesia, there is an obligation on behalf of the doctor to wiggle that needle tip to ensure it's in the location he intends prior to injecting the anesthesia? It's what I've been referring to as the wiggle maneuver.
>
> A: No, that's a particularly bad idea.
>
> Q: All right. Now, first off, is that so–called wiggle maneuver the standard of care in peribulbar injections?
>
> A: Not now and not at the time the surgery was done.
>
> Q: Okay. Explain that for the jury.
>
> A: There was, about 25 to 30 years ago, a rash of perforations of the globe during ophthalmic surgery and most of it was technique related.
>
> And at the time what was happening is, surgery was moving from hospitals to surgery centers and the anesthesiologists were doing the anesthesia. And some of them were not completely trained and there were globe perforations. And so people published techniques to try to tell the less experienced doctors how to prevent this. And that was published I think about 20 or 25 years ago, going in with the needle and wiggling it a little and if the eye moved, it means you were in the eye.
>
> It rapidly lost favor or never really became accepted for a couple of reasons. First of all, if most of the perforations of the eye are actually double perforations where you go in and then out the back, number one. Number two, they're getting more and more rare because the techniques are getting really refined.

The third reason is there's blood vessels in this area and that needle is sharp and if you go in there and you go like this, you can lacerate the blood vessels and cause a big hemorrhage. And a big hemorrhage behind the eye is just as big a complication as a needle in the eye.

So, basically, that is not a technique we teach anymore, and it's no longer or probably never was the standard of care.

Q: Okay. Dr. Kraushar came before this jury and identified that he has written an article. I believe the date was 1996 where he describes that wiggle maneuver. Is it your opinion that that is not the standard of care as of the time of this surgery?

A: That's correct. It is not the standard of care.

* * *

Q: Now, plaintiff's expert told this jury perforation of the globe with the needle is an accepted risk of peribulbar anesthesia, however, actually injecting the anesthesia into the globe is not acceptable because you have to wiggle it first. Do you have a response to that?

A: All of these occurrences are really rare and they are known complications, both the perforation of the eye and injection into the eye, and hemorrhage behind the eye and hitting the optic nerve. These things often happen, but they happen rarely. [sic]

In my opinion none of them necessarily are negligent. As long as the technique was done correctly, it essentially means a rare technique – a rare mishap that happened not due to technique, but because of some other reason.

Q: I want to spend just a moment there and distinguish for the jury the difference between a known complication and negligence.

A: Unfortunately, doctors are human, and the human body doesn't always heal the way we want it to heal. And so you can do ten surgeries on ten patients and do exactly the same technique, exactly every time and it will work nine times, but it won't work the tenth and we can't necessarily explain why.

- 15 -

So, if you've got a procedure that has known reported complications and you follow all the technique correctly during that procedure and you get a complication, that's why your doctor gives you a form consent before the surgery, to tell you, look, these things can happen. And even if I do the best job I can do, something bad may still happen.

N.T. Trial, 7/20/2011, at 37-42.

On July 21, 2011, Dr. Fernandes' second expert, Dr. Nicholas Taylor Iliff, testified that Dr. Fernandes had met the standard of care when injecting the local anesthesia. Dr. Iliff described the method used by Dr. Fernandes and the reasons why that procedure represented the standard of care. He concluded his discussion of Dr. Fernandes' technique, stating:

And what's done is to delineate exactly where the end of the needle is to actually hit the bone under the eye so you know where it is. Because if you hit the bone, it's something hard, if you're putting a needle in around the eye, there are soft tissues that make it hard to tell exactly where the needle is.

So what you do is you advance the needle away from the eye downwards and out until you hit the bone that tells you exactly where the needle is. And then you back it up a little bit because it's hard to inject when it's pushing up against the bone. You back it up a little bit and give the injection.

During the injection there are some things that you look for that lets you know that the injecting is going the way you expect it to, and that is how the tissues swell, how hard it is to inject and so forth.

And all those things were done and Doctor Fernandes stated this is how he did it, and this is what he knows. And for those reasons I felt the injection was done completely within the standard of care.

N.T. Trial, 7/21/2011, at 24-25.

Dr. Iliff was then asked about the wiggle maneuver that had been advocated by Dr. Kraushar as the standard of care.

> There are problems with that [use of the wiggle maneuver and why it is not the standard of care]. In a normal situation … let's say a person is having cataract surgery and they haven't had an injury, they don't have any swelling, they haven't had any bleeding, when you put the needle in you have some risk of hitting a blood vessel, of hitting a muscle, or hitting a nerve even. Even some risk of hitting the eye.
>
> And what you try to do is place the needle so it causes the least trauma, the least likely to cause any injury to any of those structures.
>
> In a traumatized orbit, such as was the case here, things are swollen. The vessels are swollen. The blood vessels are bigger than normal. Things aren't necessarily exactly in the right place, but they're more sensitive to any kind of trauma.
>
> So even more important, when you place the needle you move it as little as possible. You move it straight in to where you want it. In this case it was necessary to back it up a little bit and give the injection.
>
> If you wiggle it side by side, the front of the needle is actually quite sharp and you can lacerate blood vessels, cause significant bleeding. Even if you have hit the eye you can lacerate the side of the eye and cause more damage.
>
> So my feeling is it's a bad idea. I was certainly never taught to do that and we don't teach people to do that at Johns Hopkins. And so I feel that it is not really what you should do.

*Id*. at 26-27.

The foregoing represents the essence of the testimony from Chiodetti's and Dr. Fernandes' experts. The testimony of all three is clear, concise and self-contained. The testimony regarding the standard of care in administering local anesthesia to the ocular orbit by injection was not

dependent upon other evidence of causation. Moreover, Dr. Kraushar admitted in testimony that other doctors believed the wiggle maneuver was not the only standard of care. Drs. Duker and Iliff described a different accepted methodology and opined that Dr. Fernandes followed that standard of care, while explaining why they disagreed with the wiggle maneuver.

Therefore, the jury's determination that Dr. Fernandes was not negligent and had not breached the standard of care was supportable based on the consideration of all of the evidence regarding the standard of care by itself. Even if Chiodetti's blindness in the one eye was the result of an injection of anesthesia into his eye, based upon the testimony of Drs. Duker and Iliff, the jury could still believe there was no negligence in the failure to wiggle the needle. Additionally, the verdict form, filled out by the jury, clearly indicted negligence and causation were separate considerations and that if the jury found no breach of the standard of care then it was not to consider causation. *See* Jury Verdict Form. This form reflected the instructions given to the jury by the trial judge, who did not link evidence of causation with the determination of breach of standard of care. Accordingly, we see no reason to suppose the jury's determination was tainted by Dr. Iliff's improper testimony regarding causation.

The second aspect of this claim, that Dr. Iliff's testimony was improperly cumulative, also fails. In his brief, Chiodetti only argues the causation aspect of Dr. Iliff's testimony as cumulative. Because the jury did

not reach causation, any error in that regard was harmless. ***See Lykes v. Yates***, ***supra***.

Chiodetti's third argument is that the trial court erred in precluding him from remarking in closing argument, that Dr. Fernandes had failed to present the testimony of Chiodetti's subsequent treating physician, Dr. Sivalingham, despite stating he would do so in the opening statement. Specifically, Chiodetti asserts:

> [Dr. Fernandes] ardently argued in closing that the records of Dr. Sivalingham was the "smoking gun" relieving [Dr. Fernandes] of liability. [Chiodetti] should have been permitted to draw the jury's attention to the fact that the defense rested his case on Dr. Sivalingham, but did not elicit his testimony.

Chiodetti's Brief, at 23. Chiodetti's claim fails for multiple reasons.

First, a review of closing argument on behalf of Dr. Fernandes indicates the references to Dr. Sivalingham addressed causation, not standard of care. Because the jury never reached the issue of causation, any such error was irrelevant. ***Lykes***, ***supra***.

Next, Chiodetti was essentially seeking an adverse inference from the failure to produce Dr. Sivalingham. However, Dr. Sivalingham was equally available to both parties as a witness. An adverse inference is not available when the witness is available to both parties. ***Kovach v. Soloman***, 732 A.2d 1, 8 (Pa. Super. 1999).

Chiodetti is not entitled to relief on this issue.

In his fourth issue,[9] Chiodetti argues the trial court erred in permitting defense expert, Dr. Jay Duker, to testify even though Dr. Fernandes did not identify Duker or provide his expert report until well past the expiration of the discovery deadline.

> The trial court should consider the following factors when determining whether or not to preclude a witness from testifying for failure to comply with a discovery order:
>
> (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified,
>
> (2) the ability of that party to cure the prejudice,
>
> (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of cases in the court,
>
> (4) bad faith of [sic] willfulness in failing to comply with the court's order.

***Jacobs v. Chatwani***, 922 A.2d 950, 961-62 (Pa. Super. 2007) (citation omitted).

Considering these factors, Chiodetti is not entitled to relief. While it is true that Chiodetti did not know Duker's name in a timely fashion, the opinion Duker espoused was certainly known. Frankford Hospital originally retained Dr. Nicholas J. Volpe to testify on its behalf. Dr. Fernandes

---

[9] This was the fifth listed issue in Chiodetti's statement of questions involved, ***see*** Chiodetti's Brief at 5-6, but was the fourth issue in the body of the brief. We are addressing the issues in the order they appear in the body of the brief.

intended to rely upon Frankford Hospital's experts in his defense. It is undisputed that Dr. Volpe's report was supplied to Chiodetti in a timely fashion. After the discovery deadline passed, it became obvious to Dr. Fernandes that the hospital would be released, therefore, Dr. Duker was retained in the event Dr. Volpe would not testify.

Dr. Duker's identity and report were supplied to Chiodetti no later than April 21, 2011, approximately three months prior to trial. **See** N.T. Trial, 7/18/2011, at 32. Importantly, Dr. Duker specifically adopted Dr. Volpe's positions regarding Dr. Fernandes' liability. Further, the trial court noted, and the certified record confirms, that Dr. Kraushar received Dr. Duker's report with sufficient time to author a rebuttal. **Id**. at 31. We fail to see how Chiodetti can credibly claim surprise when his expert authored a report addressing the "surprising" opinion.

The record further reflects that there was no disruption of the orderly process of the trial.

The only remaining factor to consider is whether Dr. Fernandes willfully ignored the discovery deadlines. The trial court concluded that Chiodetti suffered no prejudice. **Id**. at 33-34.[10] We agree.

_____

[10] Specifically, the trial court stated, "Well, I attribute that motive to them [seeking to present expert opinion after discovery deadline without seeking extraordinary relief], but I don't necessarily accept that. Counsel has strategy. I'm not really interested in strategy. What I'm interested in is whether or not you were prejudiced by that. You have an expert report on
*(Footnote Continued Next Page)*

The certified record reflects that Chiodetti had ample time to consider and respond to Dr. Duker's report. The substance of Dr. Duker's opinion was known to Chiodetti through Dr. Volpe's report, which was issued in a timely fashion. Accordingly, we find no abuse of discretion in the trial court's decision allowing Dr. Duker to testify.

Chiodetti's final claim is that the trial court erred in allowing Dr. Fernandes to use demonstrative evidence without having supplied those exhibits as part of mandatory pre-trial discovery exchange. Specifically, Chiodetti refers to anatomical illustrations of the eye. Chiodetti does not complain that the exhibits were inaccurate. His claim is that he was prejudiced by defense experts referring to accurate depictions of the eye to illustrate their testimony.

The trial court opinion notes that the trial judge did not explain his reasons for denying Chiodetti's pre-trial motion to preclude. However, the trial court opinion points out that when the illustrations were actually used at trial, Chiodetti made no specific objection to their use.

Based on or review, we find the motion *in limine* preserved the issue, and further conclude Chiodetti has failed to demonstrate how he suffered any prejudice from the jury seeing an accurate depiction of the eye. Regarding other trial exhibits, we note that Chiodetti was presented with a

_(Footnote Continued)_ ————————

rebuttal. So, frankly, I'm not going to preclude it based on possibly negligence – rather prejudice *per se*."

list of the exhibits Dr. Fernandes might use, which included such items as Chiodetti's work records, his medical records, and answers to interrogatories. Chiodetti presumably possessed the majority of the proposed exhibits. Chiodetti has not claimed, much less demonstrated, any prejudice he suffered from the introduction of any other of Dr. Fernandes' trial exhibits. Accordingly, he is not entitled to relief on this issue.

Judgment affirmed.

Judge Strassburger joins this memorandum.

Judge Bowes files a dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/6/2015