J. S73015/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

IN RE:  C.F., A/K/A C.F., A MINOR    :    IN THE SUPERIOR COURT OF
    :        PENNSYLVANIA
    :
APPEAL OF:  D.F., FATHER    :    No. 674 WDA 2016

Appeal from the Order Entered April 15, 2016,
in the Court of Common Pleas of Allegheny County
Orphans' Court Division at No. CP-02-AP-0000075-2015

BEFORE:  FORD ELLIOTT, P.J.E., LAZARUS AND JENKINS, JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:    **FILED NOVEMBER 14, 2016**

D.F. ("Father") appeals from the order dated April 6, 2016, and entered April 15, 2016,[1] in the Court of Common Pleas of Allegheny County, Orphans' Court Division, granting the petition of the Allegheny County Office of Children, Youth and Families ("CYF") and involuntarily terminating his parental rights to his dependent, male child, C.F. ("Child"), born in March of 2013, pursuant to the Adoption Act, 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8), and (b).[2]  After review, we affirm.

---

[1] While the order was dated April 6, 2016, notice pursuant to Pa.R.C.P. 236 was not provided until April 15, 2016.  ***See Frazier v. City of Philadelphia***, 735 A.2d 113, 115 (Pa. 1999) (holding that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given").

[2] In the same order, the trial court terminated the parental rights of Child's mother, J.B. ("Mother"), also pursuant to Sections 2511(a)(2), (5), (8), and (b).  Mother has filed an appeal at Superior Court Docket No. 609 WDA 2016.

The trial court summarized the relevant procedural and factual history as follows:

> The family came to the attention of CYF on the day of the child's birth – [in] March [of] 2013 – when Mother and the infant tested positive for cocaine and methadone. CYF did not remove the child at that time. The child remained with Mother until they were discharged on April 1, 2013. Father was at the hospital when the child was born. He was listed as the Father on the birth certificate and acknowledged paternity at a later time. CYF installed in-home services in weeks after Mother's discharge. CYF offered similar services to Father, but soon after the birth, Father was incarcerated. Only a couple weeks later, on April 18, 2013, CYF removed the child after allegations of further drug use. Following a shelter hearing, the child was returned to Mother's care so long as she resided with her step-sister. The child remained in Mother's care until June 6, 2013, when he was removed following another Emergency Custody Authorization. Mother had tested positive for cocaine, opiates, and benzodiazepines; the caseworker had witnessed Mother "manipulate" – i.e., tamper – with the urine screen. On June 12, 2013, the child was adjudicated dependent, and ultimately never returned to either parent's care. The child has been placed in the foster home of C.D. and R.M. R.M. is Mother's step[-]sister.
>
> CYF established a Family Service Plan ("FSP") to aid in reunification of the parents with their child. FSPs are comprised of goals. The goals are designed to address and resolve the conditions that led to the child's removal from parental care. . . .
>
> . . . .
>
> Meanwhile, Father was largely non-compliant with his goals. Of course, this is in large part due to his repeated incarceration. He was incarcerated soon after the child's birth in March 2013. He was released in February 2014, but was incarcerated

again from June 2014 until October 2015; his second release came nearly seven months after the TPR petition was filed. Father purportedly took some parenting classes while incarcerated and participated in a program during the brief window he was released. He did not address his drug and alcohol goal until his latest release in October 2015, after the TPR was filed. And his visits were only semi-consistent at best. Father has visited with the child, by the Court's count, perhaps as few as 17 times over the entirety of the child's three[-]year life. He was entitled to one visit per month while incarcerated at the Allegheny County Jail. Upon his release, he could visit with the child four times per month. Yet there were months at a time where Father did not visit with the child. During the life of this case, Father has either failed to comply with the court-ordered FSP goals, or he has been incarcerated. . . .

Trial court opinion, 6/10/16 at 1-3 (citations to record omitted).

On April 5, 2015, CYF filed a petition to terminate parental rights. Thereafter, the trial court conducted a hearing on April 6, 2016. At the hearing, CYF presented the testimony of CYF caseworker, Darlene Lewis, and Family Resources prevention services specialist (also referred to as a parenting specialist), Mary Safrin. Father additionally testified on his own behalf. Counsel further stipulated to the submission of the psychological evaluations of Neil Rosenblum, Ph.D., clinical psychologist.[3] (Notes of testimony, 4/6/16 at 130-132.) While Mother was present, she did not

---

[3] Dr. Rosenblum's evaluations, which included individual evaluations of Mother and foster parents and interactional evaluations of Child with Mother and foster parents, were marked as Exhibit CYF 5. Father failed to appear for his scheduled evaluations. (*See* Exhibit CYF 5, Psychological Evaluation, Dates of Evaluation: 11/24/15, 12/4/15.)

testify and was absent from the courtroom for a lengthy portion of the hearing.

By order dated April 6, 2016, and entered April 15, 2016, the trial court involuntarily terminated Mother's and Father's parental rights to Child. On May 10, 2016,[4] Father, through appointed counsel, filed a timely notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Father raises the following issues for our review:

1. Did the Trial Court commit fatal and reversible error in finding that [CYF] met [sic] their burden of proof and proved by clear and convincing evidence that CYF provided reasonable efforts to Father, D.F. to reunify Father with his child, C.F.?

2. Did the Trial Court commit fatal and reversible error in allowing testimony from the caseworker regarding father's understanding of his goals in being reunified with his child C.F.?

3. Did the Trial Court commit fatal and reversible error in finding that [CYF] met their burden of proof and proved by clear and convincing evidence that terminating the parental rights of D.F. will best meet the needs and welfare of C.F., pursuant to 23 Pa.C.S.A. [§ 2511(b)]?

Father's brief at 1.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

---

[4] While Father' notice of appeal is stamped as filed May 11, 2016, it is docketed May 10, 2016.

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, 9 A.3d [1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is guided by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially,

> the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*), quoting *Matter of Adoption of Charles E.D.M. II*, 708 A.2d 88, 91 (Pa. 1998).

In this case, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), and (8), as well as (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). As Father does not raise a challenge to a finding of grounds for termination under Section 2511(a) in his statement of questions involved section of his brief, we find the issue is waived. *Krebs v.*

*United Refining Company of Pennsylvania*, 893 A.2d 776, 797 (Pa.Super. 2006) (stating that, a failure to preserve issues by raising them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues). We, therefore, analyze the court's termination pursuant to Section 2511(b) only, which provides as follows:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §§ 2511(b).

With regard to Section 2511(b), the Pennsylvania Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M.*, 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare"

> requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "[I]n cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010) (citations omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010), citing *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa.Super. 2008) (internal citations omitted).

Instantly, in examining Section 2511(b) and finding sufficient grounds for termination, the trial court concluded:

> According to Dr. Neil Rosenblum's psychological evaluation, the child is thriving with his pre-adoptive foster parents C.D. and C.D.'s mother R.M. He calls C.D. "Mom" and R.M. "Mimi." The child enjoys attention from R.M.'s paramour who he calls "poppy" as well as R.M.'s younger children. The child's speech and attention span [have] improved while in the foster parent's care. Dr. Rosenblum found that the foster parents are strongly attached to the child, who is the center of attention in the

home. He has lived with the family essentially his entire life. Critically, Dr. Rosenblum found that "removing C.F. from his present family environment would be not only highly disruptive to his developmental progress and attachment, but would be traumatic and likely cause severe emotional distress for this child."

Meanwhile, Father outwardly refused to attend his scheduled evaluation appointments, even though it was clear he was aware of the dates and even though he had visited the child in the morning of one of the scheduled sessions. Dr. Rosenblum could not speculate as to the interaction between Father and child. However, it is obvious to this Court that Father – who has had even less contact than Mother – could not have such an impact on the child's life that it would cause this Court to disagree with Dr. Rosenblum's ultimate conclusion. Because the child is placed with kin, it is this Court's hope that positive, healthy contact will remain between the child and his biological parents. But it is crystal clear that termination serves the child's best needs and welfare. The Court feels strongly that the child's pre-adoptive foster parents are the best judges of whether future contact is in the child's best interests.

Trial court opinion, 6/10/16 at 8 (citations to record omitted).

Father, however, argues that, despite his incarceration, he has made efforts at completion of his goals, including drug and alcohol treatment and visitation with Child. (Father's brief at 13.) Likewise, Father emphasizes his bond with Child and ability to provide for Child. (*Id.* at 13.) Father asserts:

Although [Father] was incarcerated for seven (7) months, he worked on his goals. Specifically he attended a drug and alcohol treatment center in Pyramid, in Wilkinsburg, PA; he has been free from all substances for several years and has not tested positive from any random drug screens; and most importantly maintained contact

> with his son. [Father] . . . visited with his child at least once monthly when [Father] was incarcerated and two (2) times per month when he was released from incarceration. Testimony from persons who supervised the visits on a regular basis stated [Father] was very appropriate during the visits. When asked what Father did while visiting his son, [Father] replied we: read books, crawl under the table and play peek-a-boo, played with toys and gave him all of his attention during the visits "and whatever toys he wants to play with or whatever he likes to do, that's what I will do." [Father] believes he has a real bond with his son and is capable of providing him with safe and appropriate housing, meeting his physical and emotional needs. Father stated visits with his son are important to him.

> [Father] is currently employed and capable of providing a home for his son with his parents. Unfortunately, the caseworker stated she did not have time to investigate the home or further explore the concerns Father expressed "could" be a barrier.

*Id.* (citations to record omitted).

This court finds that Father's argument regarding Section 2511(b) lacks merit. Upon review, as the trial court's factual findings are supported by the record, and the court's legal conclusions are not the result of error of law or abuse of discretion, we affirm the trial court's order with regard to Subsection (b). *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Next, we turn to whether reasonable efforts were made at reunification of Father and Child. Father argues that CYF failed to conduct Family Findings "to assure [Child] maintained contact with his family of origin while Father was incarcerated" and "failed to investigate a home where [Child]

could have resided with his Father once Father had been released from incarceration." (Father's brief at 10.)

We note that the Pennsylvania Supreme Court has held that Section 2511 does not require reasonable efforts as it relates to termination of parental rights. *In re D.C.D.*, 105 A.3d 662, 673-674 (Pa. 2014).

> [W]hile reasonable efforts should be considered and indeed, in the appropriate case, a trial court could insist upon their provision, we hold that nothing in the language or the purpose of Section 6351(f)(9) forbids the granting of a petition to terminate parental rights, under Section 2511, as a consequence of the agency's failure to provide reasonable efforts to a parent.

*Id.* at 675. Thus, we also find this claim to be without merit.

Lastly, we review Father's claim of error in allowing the testimony of the CYF caseworker regarding his understanding of his goals in being reunified with Child. Specifically, the CYF caseworker was asked, "Did you have any doubt whether [Father] or [Mother] understood what CYF was expecting from them?" to which Father objected as speculative. (Notes of testimony, 4/6/16 at 22.) Father argues that the trial court incorrectly overruled his objection to the caseworker's testimony that she believed he understood his goal requirements as speculative. (Father's brief at 11.) The trial court, however, explained that the question was not calling for speculation, as it was seeking the caseworker's thoughts. Further, the court reasoned, "Father did not testify that he was confused by CYF's requests, or that he did not know how to contact his caseworker, or any other hallmark

of misunderstanding. . . . His argument was never that he misunderstood what he was asked to do." (Trial court opinion, 6/10/16 at 6.) With this, we agree.

The decision of whether to admit or exclude evidence is committed to the sound discretion of the trial court. ***Buchhalter v. Buchhalter***, 959 A.2d 1260, 1263 (Pa.Super. 2008). ***See also Schuenemann v. Dreemz, LLC***, 34 A.3d 94, 100-101 (Pa.Super. 2011); ***Jacobs v. Chatwani***, 922 A.2d 950 (Pa.Super. 2007). This court may only reverse upon a finding of a clear abuse of discretion. ***Id.***

Here, as we agree with the trial court, we find that the trial court did not abuse its discretion by admitting the testimony of the caseworker into evidence. Hence, this claim fails, as well.

Based on the foregoing analysis, we affirm the order of the trial court terminating Father's parental rights to Child.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/14/2016